Esther Marion ARMSTRONG, Executrix, Plaintiff,

v.

MOTOROLA, INC., Defendant.

No. 54 C 19.

United States District Court
N. D. Illinois, E. D.

May 14, 1964.

Dana M. Raymond, Brumbaugh, Free, Graves & Donohue, New York City, George N. Hibben, Davis, Lindsey, Hibben & Noyes, Chicago, Ill., for plaintiff.

Mueller & Aichele, Foorman L. Mueller, George Aichele, Chicago, Ill., of counsel, for defendant.

ROBSON, District Judge.

### FINDINGS OF FACT

#### I. NATURE OF ACTION AND PLEADINGS

1. This is an action under the patent laws of the United States for infringement of the following three patents:

a. Patent No. 1,941,066 (hereinafter called the '066 patent), issued December 26, 1933, to Edwin H. Armstrong on an application filed July 30, 1930. Plaintiff relies on claims 8, 9 and 10.

b. Patent No. 1,941,069 (hereinafter called the '069 patent), issued December 26, 1933, to Edwin H. Arm-

strong on an application filed January 24, 1933. Plaintiff relies on claims 1 and 2.

c. Reissue Patent No. 21,660 (hereinafter called the Reissue patent) issued December 17, 1940, to Edwin H. Armstrong on a reissue application filed October 21, 1940. This is a reissue of original Patent No. 2,215,284, issued September 17, 1940, on an application filed February 19, 1940. Plaintiff relies on claims 1, 2, 4 and 6.

Patents '066 and '069 had expired on December 26, 1950, and the Reissue expired September 17, 1957.

2. The complaint, filed on January 6, 1954, charges Motorola, Inc., with infringing, during the six years preceding the filing of the complaint and until their expiration, Letters Patent Nos. 1,-941,066, 1,941,069 and Reissue 21,660. The complaint also charges infringement of United States Letters Patent Nos. 1,-941,068 and 2,098,698. Plaintiff dropped her charge of infringement of such patents, and at the trial the Court on January 3, 1962, granted a motion to dismiss with respect to U. S. patents Nos. 1,941,068 and 2,098,698 (Trial Record 5101–2).

3. The answer, filed on January 6, 1956, raises the defenses of noninfringement, license, invalidity of the patents in suit and laches.

## II.  THE PARTIES

4. Plaintiff is Esther Marion Armstrong, the widow and Executrix of the Last Will of Edwin Howard Armstrong, the original plaintiff in this action. Major Armstrong died on February 1, 1954. He was the sole owner of the three patents in suit. After a ruling on a contested motion, Esther Marion Armstrong was substituted as plaintiff by orders of this Court dated March 28, 1955, and April 12, 1955.

5. Defendant is Motorola, Inc. (prior to 1947 being known as Galvin Manufacturing Corporation and herein referred to as Motorola), an Illinois corporation organized in 1928, having a place of business in the City of Chicago, within the Northern District of Illinois, Eastern Division.

## III.  RADIO APPARATUS INVOLVED IN THIS ACTION

6. Plaintiff charges infringement of the three patents in suit by virtue of the manufacture and sale by Motorola of the following radio apparatus:

a. The frequency modulation broadcast receiver included in chassis HS87 for Motorola AM-FM radios, referred to herein as "HS87" (Plaintiff's Exhibit 25);

b. The frequency modulation broadcast receiver included in chassis HS89 for Motorola AM-FM radios, referred to herein as "HS89" (Plaintiff's Exhibit 26);

c. The frequency modulation sound receiver included in chassis TS-5 or TS-7 for Motorola home television broadcast receiving sets, referred to herein as "TS-5" (Plaintiff's Exhibit 27);

d. The frequency modulation sound receiver included in chassis TS-4D for Motorola home television broadcast receiving sets, referred to herein as "TS-4" (Plaintiff's Exhibits 28, 29):

e. The two-way FM communication equipment operating on frequencies between 25 and 50 megacycles, referred to herein as "25–50 Mc" (Plaintiff's Exhibit 30);

f. The two-way FM communication equipment operating on frequencies between 152 and 162 megacycles, referred to herein as "152–162 Mc" (Plaintiff's Exhibit 31); and

g. All other FM broadcast receivers, television sound receivers and FM communication equipment which are materially similar to the foregoing apparatus in structural and operating characteristics and which were manufactured and sold by Motorola within six years of the

filing of the complaint herein and before the expiration of the patents in suit.

Major Armstrong gave Motorola notice of infringement by letters dated December 15 and 20, 1948 (Plaintiff's Exhibits 12 and 13; Trial Record 3731–2).

## IV. PROCEEDINGS BEFORE TRIAL

7. Motorola's motion for a separate trial on its defense of laches and estoppel was denied by order of this Court on December 14, 1959.

8. On January 20, 1961, Dean George R. Town was appointed, by order of this Court and with the consent of the parties, to act as an impartial technical expert for the Court.

9. On April 19, 1961, Motorola filed a motion for summary judgment as to plaintiff's charges of infringement under patents numbers 1,941,069 and the Reissue patent with respect to FM broadcast receivers and television sound receivers and with respect to the validity of claims 4 and 6 of the Reissue patent. Defendant's motion for summary judgment was denied by this Court in a memorandum opinion dated June 14, 1961.

10. The action came on for trial before Judge Robson on October 30, 1961, and proceeded from day to day until January 5, 1962. During the trial, seven witnesses were called by plaintiff and eight witnesses were called by defendant. Dean George R. Town was called as a witness by the Court and testified in response to questions by the Court and each of the parties.

## V. ARMSTRONG PATENT NO. 1,941,069

### A. The Discovery

11. Major Armstrong informed the radio engineering profession how the audible effects of noise in radio telephony could be reduced by employing a particular kind of frequency modulation and by operating over a bandwidth substanti-

ally wider than was theretofore employed in conventional radio signaling (Trial Record 5152–3; 4366).

12. The teaching of Major Armstrong concerning the wide band FM system was contrary to earlier practice and theory, both as to the results obtained and the method whereby such results were obtained (Trial Record 5153, 2691–2; 4101–4; 810–3).

13. The emergence of the wide band FM system was a development which profoundly influenced the radio art (Trial Record 5153, 4427–9; Court Exhibit 1, pp. 40–45 [1]).

14. The basic characteristics of the wide band FM system are as follows:

a. That the swing of the carrier at the transmitter in accordance with the intelligence to be transmitted shall be substantially greater than the range of audible frequencies for the system;

b. That the receiver in all of its radio and intermediate frequency stages shall have a pass band sufficiently wide to receive and amplify the wide swinging carrier throughout the full extent of its excursions;

c. That the receiver shall be substantially nonresponsive to amplitude variations caused by the disturbances; and

d. That the receiver shall have a selective system which provides for full audible response to the wide swings of the carrier and provides for substantially less audible response to the narrow swings of the carrier at audible rates which are caused by the disturbances.

(Plaintiff's Exhibits 24, 40, 90, 91, 92; Trial Record 5153, 5422; Court Exhibit 1, pp. 40–45).

15. Major Armstrong's teaching was based in part on his observation that in a frequency modulation receiver, tube noise and other spectrum-like disturbances may manifest themselves as frequency varia-

[1]. Court Exhibit 1 refers to the Report of Dean George R. Town marked at the trial as Court Exhibit 1.

tions in the received signaling wave and that such frequency variations will, in the presence of a strong carrier, be limited in extent in so far as they are capable of producing an audible response from the receiver (Trial Record 143, 200–6, 3278, 4093–4101; '069 patent, p. 3, lines 116–121; Plaintiff's Exhibit 24, pp. 705–709; Plaintiff's Exhibit 40, pp. 4–5).

16. Major Armstrong taught that tube noise and spectrum-like disturbances would also manifest themselves as amplitude variations on the carrier, and that the effect of such amplitude variations, when of less strength than the carrier, could be effectively suppressed or eliminated in the receiver (Plaintiff's Exhibit 24, pp. 703–6; '069 patent, p. 3, lines 38–46).

17. In radio communication by amplitude modulation, the bandwidth for the transmitter and the receiver depends upon the range of audible frequencies to be reproduced in the receiver. In the normal practice with amplitude modulation, the bandwidth is substantially equal to twice the range of audible frequencies to be reproduced (Trial Record 4105–8, 5158; Plaintiff's Exhibit 32E, p. 69).

18. In the wide band FM system, the bandwidth for the transmitter and the receiver is not twice the range of audible frequencies to be reproduced. The bandwidth depends on the range of excursion of the wide swinging carrier and is several times the bandwidth required for amplitude modulation (Plaintiff's Exhibit 24, pp. 709–16; Trial Record 4090–7, 5422; Plaintiff's Exhibit 127).

19. The receiver in the wide band FM system is made substantially nonresponsive to amplitude variations of the received wave caused by tube noise and other disturbances when such noise and disturbances occur in the receiver at levels of strength which are lower than the received carrier. Such nonresponsiveness is brought about by limiting and balancing (Trial Record 1278–85; Plaintiff's Exhibit 24, pp. 702–6; '069 patent).

20. Armstrong published a formula for the improvement with respect to the suppression of noise which could be obtained with the wide band FM system as compared with amplitude modulation when operating at the same carrier frequency and power and transmitting and receiving the same signal. His formula is that the improvement in terms of voltage ratio for noise in the two systems is equal to about 1.7 times the deviation of the wide band carrier (½ peak-to-peak swing) divided by the audible frequency range for the two systems. The formula provides a correct measure of the improvement in suppression of noise that may be obtained in the wide band FM system as compared with amplitude modulation (Plaintiff's Exhibit 24, p. 710; Trial Record 1643–5, 3011–2, 3420–6, 3444–6).

21. The wide band FM system is effective, as compared with amplitude modulation, in reducing the effects of disturbances caused by tube noise and other random noise caused by fluctuation in the motion of electrons in the receiver, ignition noise and other interference caused by electrical equipment not intended for radio purposes, static caused by thunderstorms and other natural electrical phenomena, multipath interference and interference from other radio stations (Trial Record 796–812, 3134).

22. The wide band FM system was also effective in the late '30s and thereafter to extend the practical range of communication in radio signaling as compared with amplitude modulation operating at the same carrier frequencies (Trial Record 796–812, 2281–4, 3116–23, 5154–5).

B. Disclosure of Armstrong Patent No. 1,941,069

23. The '069 patent disclosed the essential structural and operating characteristics of the wide band FM system (Trial Record 5154).

24. The '069 patent described in qualitative terms the art of suppressing

noise by a particular system of frequency modulation as follows:

"I have discovered that by imparting a greater swing to the frequency of the transmitted wave than can exist in the disturbances due to tube irregularities and providing means for selecting these large swings of frequency which are at the same time substantially not responsive to the lesser swings due to the tube disturbances or to the variations in amplitude due to these disturbances, that a very great improvement in transmission can be produced." ('069 patent, p. 1, lines 71–80)

25. The '069 patent disclosed that the frequency variations caused by noise and spectrum-like disturbances in the presence of a strong carrier and which are capable of creating an audible response from the receiver will be limited in extent and not substantially greater than the audible frequency range of the receiver (Trial Record 143–4; '069 patent, p. 3, lines 116–20).

26. The '069 patent disclosed that the swing of the carrier was to be many times greater than the audible frequency range ('069 patent, p. 2, lines 66–72).

27. In the particular example described in the '069 patent, the swing was equal to ten times the audible frequency range for that embodiment. The swing was 100,000 cycles and the audible frequency range was 10,000 cycles. The '069 patent was not limited in its teaching to any particular audible frequency range or to any particular optimum swing for various distances of transmission and for different classes of services (Trial Record 4090–7, 5323–6, 5331).

28. The '069 patent disclosed that for use in the system described therein, the transmitter described in the '068 patent is to be modified by adding multipliers and increasing the bandwidth so as to provide for a swing many times greater than the audible frequency range ('069 patent, p. 2, lines 66–72, p. 3, line 139, to p. 4, line 10; Trial Record 171–4).

29. The '069 patent disclosed that a receiver for use in the wide band FM system might employ the same general method for translating variations in frequency of radio currents into currents of audible frequency that was disclosed in the 1,941,447 (hereinafter referred to as '447) patent. That general method comprised (a) the use of networks for providing a linear or proportional response to variations in frequency over the range for which the receiver was designed, as illustrated in the '447 patent (Fig. 2) by the networks 40, 41 and 39, 40, 41, and in the '069 patent (Fig. 2) by the networks 52, 54 and 53, 55 and (b) the method of balancing the currents of audible frequency from each of the detectors illustrated in Fig. 2 of the '447 patent and Fig. 2 of the '069 patent ('069 patent, p. 2, lines 31–45, 73–84; '447 patent, p. 2, lines 64–79).

30. The '069 patent disclosed that the receiver for use in the wide band FM system was to be constructed so that all of its circuits, including the radio frequency stages, the intermediate stages, the limiter and the discriminator would have a bandwidth several times greater than the bandwidth required in an amplitued modulation receiver ('069 patent, p. 2, line 73, to p. 3, line 90; p. 4, lines 11–83; Trial Record 147–50).

31. The '069 patent disclosed that the receiver for the wide band FM system might be made adequately nonresponsive to amplitude variations caused by the disturbances by means of limiting in the receiver ('069 patent, p. 3, lines 38–46, p. 4, lines 25–46) and by the use of balanced detectors ('069 patent, p. 3, lines 69–90).

32. The '069 patent disclosed that in a wide band receiver as therein described the balancing action at the detectors would be particularly effective (more effective than in a narrow band receiver) in making the receiver substantially nonresponsive to amplitude variations caused by the disturbances (Trial Record 190–3; '069 patent, p. 3, lines 69–127).

33. The '069 patent did not state that there was any criticality in the sequence of steps whereby the receiver would be made substantially nonresponsive to amplitude variations caused by the disturbances and to frequency variations caused by the disturbances (Trial Record 636).

### C. The Impact—Prior Art Practice and Theory

34. In the 1920s and early '30s, the circuits for transmitters and receivers employed in radio signaling were narrow in bandwidth, the bandwidth being about twice the range of modulating frequencies to be transmitted and received. It was accepted engineering practice that to reduce the effects of noise, the bandwidth of the circuits should be *decreased and maintained at the minimum* required for adequate reception of the intelligence. This was so widely known and generally accepted among those conversant in the art that in all of the literature of the period, including patents, it must be taken as understood or implied that the circuits were narrow unless the contrary were expressly stated. *Specifically, any suggestion that noise might be reduced by means of a system employing wide band circuits would have been considered so exceedingly radical that the suggestion could not have been conveyed except by express reference to the wide band feature*—as it was for the first time in the '069 patent and as it was not in any of the prior references cited by defendant in this case (Trial Record 4107–8, 5158–60).

35. During the 1920s, frequency modulation was proposed as a method for narrowing the bandwidth for radio communication as compared with the bandwidth requirements for amplitude modulation. The scheme was wrong as a matter of theory and unsuccessful in practice (Trial Record 812–3, 3083–93, 4104–5, 4362–6; Plaintiff's Exhibit 33, Defendant's Exhibit 7 Carson article "Notes on Theory of Modulation," 1922).

36. During the late 1920s and early 1930s, it was widely accepted in the radio engineering profession that frequency modulation would inherently distort the signal and that there were no compensating advantages as compared with amplitude modulation (Trial Record 813, 3074–3104, 4104–5). Some inventors, however, believed in frequency modulation, procuring patents in respect thereto, some of which involved *narrow* bands.

37. In the early proposals for the use of frequency modulation before 1933, it was contemplated that the bandwidth for the receiver would be the same or less than the bandwidth for an amplitude modulation receiver designed to reproduce the same range of modulating frequencies. Such a frequency modulation system would have no significant advantage over amplitude modulation in the reduction of noise (Plaintiff's Exhibit 90, p. 7, col. 3, last paragraph; Trial Record 3128–33, 3141–3, 3444–6, 5417–8).

38. In 1935, Armstrong presented a paper on the wide band FM system to the Institute of Radio Engineers (IRE) entitled "A Method of Reducing Disturbances in Radio Signaling by a System of Frequency Modulation," and he gave a demonstration at that meeting. *The IRE paper is a classic paper in the radio art* (Plaintiff's Exhibit 24; Trial Record 4371, 4399).

39. In his IRE paper, Major Armstrong reported on field tests of the wide band FM system and thereby demonstrated that the results which he claimed for the system were not simply a matter of theory and laboratory experiment which, as in the case of many other so-called static eliminators, would not materialize when subjected to actual operating conditions (Plaintiff's Exhibit 24; Trial Record 691, 3124–5, 4371).

40. In the IRE paper, Major Armstrong pointed out and explained the striking phenomenon that in the wide band FM system which he had built and tested there was an immunity from interference created by other stations that was of the same order of magnitude

as the immunity of the system to tube noise (Plaintiff's Exhibit 24, pp. 727-9; Trial Record 3135).

41. In July, 1937, John R. Carson, associated with the Bell Laboratories and a leading authority on modulation theory, published, with Thornton Fry as co-author, an article which confirmed as a matter of theory that wide band frequency modulation would provide the suppression of noise which Armstrong had demonstrated and reported on in practice in his IRE paper (Trial Record 1132, 3077-85, 3125; Plaintiff's Exhibit 109, cited by Everitt as leading reference in Plaintiff's Exhibit 90; Trial Record 4104).

42. Hans Roder, well known for his writings on frequency modulation, published articles in 1937 in which he revised his theory of frequency modulation and confirmed as a matter of theory that noise could be suppressed in radio communication by using wide band frequency modulation as described by Major Armstrong in his IRE paper (Plaintiff's Exhibit 110, p. 13; Trial Record 3148-50; see references to Roder in Plaintiff's Exhibits 90, 92 and 24).

43. In June, 1940, William L. Everitt, defendant's principal expert at the trial, presented a paper before the American Institute of Electrical Engineers, entitled "Frequency Modulation" (Plaintiff's Exhibit 90). The paper gives an excellent account and explanation in scientific terms of how noise and interference can be reduced by frequency modulation and is a leading reference for students of the subject (Trial Record 5196-7). In the paper, Everitt stated that Armstrong had demonstrated that frequency modulation provides an important method of distinguishing between desired and undesired signals and that the earlier proposals for the use of frequency modulation were such that there would be no advantages over amplitude modulation (Court Exhibit 1, pp. 41-2; Trial Record 3124-5, 3141-2; Plaintiff's Exhibit 90, p. 1, col. 3, p. 2, col. 1, p. 7, col. 3, p. 8, col. 1).

44. At the trial, Daniel E. Noble, an Executive Vice President of Motorola and well qualified to testify concerning the development of frequency modulation, characterized Major Armstrong's work as being "creative" (Trial Record 4397-8, 4413-5, 4427-9).

D. The Claims in Patent No. 1,941,069

45. The term "variation in frequency" appearing in the two claims of the '069 patent means, in the light of the specification, the peak-to-peak swing in frequency of the wave as distinguished from its deviation from center frequency ('069 patent, p. 3, lines 91-108 and claims 1 and 2).

46. The requirement in the two claims of the '069 patent that such variation in frequency shall be substantially greater in extent than the range of good audibility means that such variation in frequency shall be several times greater than the audible frequency range to be transmitted and reproduced at the receiver ('069 patent, p. 2, lines 66-73; Trial Record 138-143).

47. The term "range of good audibility" appearing in the claims of the '069 patent means the range of frequencies from the output of the receiver which are of a "really audible character" ('069 patent, p. 3, lines 56-68; Trial Record 144-6).

48. The requirement in the claims of the '069 patent that amplitude variations shall be substantially eliminated or limited means that the receiver shall be substantially nonresponsive to amplitude variations caused by the disturbances. (The words "elimination," "removal" or "substantial elimination" are equivalent in radio usage and in the '069 patent to substantial or significant nonresponsiveness. Trial Record 643-50, 1278-85, 1523, 2598-2600, 2919, 2937-8, 5406-7; Plaintiff's Exhibit 90, p. 10, col. 1, lines 13-17.)

49. The requirement in the claims of the '069 patent that the "selective system" (claim 1) or "detector system" (claim 2) shall be fully responsive to the

wide variations in frequency of the signal but substantially not responsive to the lesser variations in frequency of the spectrum-like disturbances means that the translating system (discriminator) shall provide a nearly linear or proportional response to all variations in frequency within the range of the peak-to-peak swing of the carrier and that the bandwidth of all circuits in the receiver up to the audio detectors shall be sufficiently wide to pass all frequencies within the range of the wide swing of the carrier. The requirement reflects the teaching of the patent that the variations in frequency caused by the disturbances are small as compared with the wide variations of the signal and will provide a comparably small response from a wide band discriminator or translating system (Trial Record 5339–40; '069 patent, Fig. 5 and p. 3, lines 91–127; contrast Trial Record 3043–5).

50. Each of the two claims of the '069 patent particularly points out and distinctly claims the system or art of eliminating or suppressing noise in radio by the wide band FM system.

### E. The Prior References Cited by Motorola

#### Purington Patent No. 1,599,586

Filed April 27, 1922—Issued Sept. 14, 1926

51. The Purington patent related to a system for use in telegraphy or telephony in which a wobble was produced at the transmitter and the input circuit of the receiver was tuned on one portion of the wobble to provide a response to the wobble in frequency (Defendant's Exhibit 7 Purington patent, p. 2, lines 59–68; Trial Record 3382–6, 4117–20).

52. The apparatus specifically described in the Purington patent was intended for operation on frequencies near the standard broadcast band (Trial Record 5177).

53. The Purington patent did not state or suggest anything concerning noise in radio signaling or concerning the reduction of noise in radio signaling (Trial Record 4120, 5177).

54. The Purington patent expressly stated that the receiver for telegraphy was to be adjusted for sharp resonance (Trial Record 4117, 5168–9). It expressly stated that the bandwidth of the receiver was to be less wide than the bandwidth to be provided for the transmitter circuits (Patent p. 2, lines 30–34 and 59–64; p. 3, lines 98–125). The Purington patent did not expressly state that the sharply resonant receiver which was particularly described was to be redesigned and increased in bandwidth if the receiver were used for telephony (Trial Record 4121, 5168–9).

55. The Purington patent showed a lack of basic understanding of frequency modulation and disclosed no advantage or utility for any particular range of wobble in frequency (Trial Record 4117–20, 5168–76). The patent purported to give numerical examples for range of wobble and receiver bandwidth, but there were numerical errors and discrepancies in connection with each of such examples (Trial Record 2943–4, 5169–76). The numerical example given by Purington for the bandwidth of a discriminator in a receiver was 16 kilocycles. (See reference to "right hand curve" in text by Pierce (Patent p. 4, col. 2, lines 73–83) and compare with right hand curve in Defendant's Exhibit 99, Trial Record 5175; contrast Trial Record 5011–6).

56. The Purington patent showed no kind of limiter circuit (Trial Record 4120, 5179–80). A limiter could not be used in the kind of receiver described in the Purington patent (Trial Record 5180).

57. The Purington patent did not disclose the wide band FM system and did not anticipate the '069 patent.

#### Armstrong Patent No. 1,941,447

Filed May 18, 1927—Issued Dec. 26, 1933

58. The '447 patent disclosed circuits for a frequency modulation transmitter and frequency modulation receiver and

stated that such apparatus would reduce the effects of fading and static in radio telephone transmission (Trial Record 2591–5).

59. The '447 patent taught that in order to reduce noise, the bandwidth should be as *narrow* as possible (Trial Record 2610–2).

60. *The '447 patent disclosed a narrow band system*, and taught that the bandwidth of the transmitter and receiver (for an audio range of about 2500 cycles) should be 5000 cycles or less (Trial Record 2584, 2598–2600, 5157–8). There is definite internal evidence the '447 patent is a narrow band system.

61. The '447 patent did not disclose that tube noise and other spectrum-like disturbances might cause a variation in frequency and that in the presence of a strong carrier such variations in frequency would be limited in extent in so far as they were capable of producing an audible response ('447 patent).

62. The limiter in the '447 patent was for the express purpose of removing amplitude variations caused by fading (Trial Record 2591–5, 2583–91). Also it showed that amplitude variations due to static will also be greatly reduced ('447 patent, p. 2, lines 84–88).

63. The limiter disclosed in the '447 patent was not as effective for removing amplitude variations caused by disturbances as was the limiter later disclosed in the '069 patent (Trial Record 2586–93, 2608–9).

64. A receiver built in accordance with the specific instruction of the '447 patent would not be capable of operation or of adjustment to operate over a bandwidth several times the bandwidth required for amplitude modulation (Trial Record 2594, 5312–4).

65. The '447 patent did not disclose the wide band FM system and did not anticipate the '069 patent.

Dome Patent No. 1,917,102

Filed July 22, 1929—Issued July 4, 1933

66. The Dome patent related to a frequency modulation transmitter and disclosed nothing concerning the operating characteristics or structure of a frequency modulation receiver (Defendant's Exhibit 7, Dome patent; Trial Record 3249, 4116).

67. The Dome patent contained no express reference to the problem of noise in radio signaling and contained no teaching concerning how noise might be reduced (Trial Record 4116, 5162–3).

68. The Dome patent did not state or suggest that the variation in frequency at the transmitter should be greater than the range of modulating frequencies or the audible frequency range to be transmitted and received (Trial Record 3247–9, 4116–7, 5163, 5166–7).

69. The Dome patent did not expressly distinguish between what is now called the swing (peak-to-peak variation in frequency) and the deviation, defined as the variation from center frequency of the carrier (Trial Record 3240, 5163).

70. The example of a change of frequency of 20,000 cycles referred to on page 3 of the Dome patent can be interpreted as an example of a total variation in frequency (peak-to-peak swing of the carrier) that might be obtained by multiplication at the transmitter (Trial Record 3240–5, 4110–5, 5164–5). But it is probable he intended, in the light of the other sections of the patent, the 20,000 cycles to refer to the "deviation" which is one-half the total variation or "peak-to-peak swing."

71. The Dome patent expressly mentioned, *inter alia*, a modulating frequency of 20,000 cycles (Trial Record 3243–4).

72. The Dome patent disclosed erroneously that the effect of the side bands caused by amplitude modulation in the transmitter might be removed by the action of the multipliers in multiplying the frequencies of the side bands beyond the range of audibility (Trial Record 4109, 4116, 4840–1, 5165–6).

73. The Dome patent did not teach that the bandwidth of a frequency modulation transmitter or receiver should be greater than the bandwidth in ampli-

tude modulation for transmitting and receiving a comparable audible frequency range (Trial Record 4116-7, 5166-7).

74. The Dome patent did not disclose the wide band FM system and did not anticipate the '069 patent.

### Van der Pol Article

75. The article written by Balth. Van der Pol, a Dutch mathematical physicist, and published by the Institute of Radio Engineers in 1930, was a mathematical treatment and analysis of the side frequencies which may occur when a carrier frequency is varied in frequency at any particular rate. The Van der Pol article was expressly directed to the problem of the disturbances and interference which such variations in frequency might cause in radio signaling and the width of band which would be occupied by such variations in frequency. The article pointed out that such disturbances may occur unintentionally when signaling by amplitude modulation (Defendant's Exhibit 7, Van der Pol article).

76. The Van der Pol article did not disclose the form of a frequency modulated wave or the side frequencies which would be present when the carrier was modulated by more than one frequency at a time (Trial Record 2027-8).

77. The Van der Pol article disclosed nothing concerning the reception of frequency modulated waves and the reproduction of signals therefrom (Van der Pol article).

78. The Van der Pol article suggested nothing concerning the peak-to-peak swing or the deviation which ought to be employed in a practical frequency modulation system (Van der Pol article).

### Wright Patent No. 1,964,375

Filed Feb. 20, 1926—Issued
June 26, 1934

79. The Wright patent disclosed a proposal for transmitting and receiving pictures by frequency modulation (Defendant's Exhibit 7, Wright patent, p. 1, cols. 1 and 2).

80. The Wright patent was directed to the problem of removing the effects of fading and static (Patent p. 1, lines 27-51; Trial Record 4128, 4543-6).

81. The Wright patent referred to employing a limiter in a receiver and disclosed no structural characteristics for such limiter (Patent p. 2, lines 35-73; Trial Record 4129).

82. The Wright patent disclosed that the function and purpose of the limiter in the receiver was to remove amplitude variations caused by fading and also by static and strays. (Patent p. 2, lines 35-73, p. 1, lines 80-87).

83. The Wright patent stated nothing concerning the swing or extent of frequency variation which was to be employed and contemplated narrow band operation (Trial Record 4127, 5042).

84. The Wright patent stated nothing concerning tube noise or other spectrum-like disturbances which might be generated in the receiver.

85. The Wright patent did not disclose the wide band FM system and did not anticipate the '069 patent.

### Demarest Patent No. 2,047,312

Filed Dec. 1, 1926—Issued
July 14, 1936

86. The Demarest patent proposed the use of frequency modulation to reduce the effects of fading in radio signaling (Defendant's Exhibit 7, Demarest patent, p. 1, col. 1, lines 9-36, col. 2, lines 19-66).

87. Demarest built no apparatus in connection with the disclosure of the Demarest patent (Trial Record 4124-5).

88. The Demarest patent disclosed that conventional circuits were to be employed for the radio frequency and intermediate frequency stages of the receiver (Patent, p. 2, col. 1, lines 29-36).

89. In 1926, a characteristic of conventional radio frequency and intermediate frequency stages was that the circuits would be as sharply selective as possible and that the bandwidth of the re-

ceiver would be confined to the band required to pass the audible frequency range to be transmitted and received (Trial Record 4125, 5158). In the absence of any suggestion to the contrary, and in view of the state of the art at the time, it is evident that the receiver circuits in the Demarest patent were intended to be narrow.

90. The Demarest patent suggested a power limiter such as was shown in a textbook by Van der Bijl published in 1920 and the textbook had nothing to do with frequency modulation (Trial Record 3275).

### Summary of Prior References

91. The prior references as to which evidence was received at the trial did not disclose, singly or in combination, that noise could be suppressed or reduced by employing frequency modulation with a bandwidth at the transmitter and receiver substantially greater than the bandwidth required in amplitude modulation.

92. None of such prior references disclosed that the bandwidth for a frequency modulation receiver should be greater than the bandwidth for an amplitude modulation receiver operating on the same frequencies.

93. In none of such prior references was there any teaching that the peak-to-peak swing or total variation in frequency should be greater than the range of audible frequencies or modulating frequencies to be reproduced at the receiver.

94. None of the prior references disclosed that noise and disturbances in the receiver could manifest themselves as a frequency variation in the received signaling wave and that such frequency variations would in the presence of a strong carrier be limited in extent in so far as they were capable of producing an audible response.

95. The prior references, singly or in combination, did not disclose the wide band FM system.

## VI. ARMSTRONG PATENT NO. 1,941,066

### A. The Disclosure

96. The '066 patent disclosed a principle of operation for receiving and detecting a frequency modulated wave which involved heterodyning or combining the received frequency modulated wave with itself to reproduce the signal, hereinafter referred to as the synchronous heterodyne principle for frequency modulation reception (Trial Record 246–7, 4131–4, 5180–5, 5422A).

97. The synchronous heterodyne principle for frequency modulation reception consists in combining or beating at the detector the received radio wave (which is dynamically varying in frequency in accordance with the signal) with the same received wave which has been modified by being passed through reactance elements in the receiver. The combination of the waves in a nonlinear device, such as the detector, results in a heterodyning action and in reproduction of the signal (Trial Record 4131–4, 4162, 5180–5).

98. A frequency modulation receiver operating in accordance with the aforementioned principle is characterized by having at least two paths in the receiver for the received modulated wave, such paths having different characteristics of transmission for the received wave. The waves from each of the two paths are then combined at the detector (or each of the detectors if there are two detectors in the receiver) to reproduce the signal (Trial Record 5180–5, Plaintiff's Exhibit 22, p. 1).

99. The '066 patent describes a particular example of a frequency modulation receiver for telephony operating in accordance with the synchronous heterodyne principle of operation. In such a receiver, there are two paths for the received wave to each detector. One of those paths is through the amplifier stages (61 or 62 of Fig. 2 of the '066 patent) to each of the detectors. The

other path is through stage 70 (Fig. 2, supra) to each of the detectors (Trial Record 265–8).

100. The '066 patent does not state that the resistance in the reactance network 58, 59, 60 must be zero for practical operation of the circuit (Trial Record 4135–44). If resistance were present in network 58, 59, 60, a continuous variation in phase with variation in frequency of the received wave would be produced (Trial Record 4136–42).

101. If the resistance in the network 58, 59, 60 were completely neutralized, the network would produce variations in amplitude in accordance with variations in frequency of the received wave and there would be a reversal in phase at the center frequency (Trial Record 4143–4).

## B. The Claims and Their History

### The Claims

102. Each of claims 8, 9 and 10 requires that there shall be at least two paths in the receiver for passing the frequency modulated wave or currents derived therefrom. This requirement emphasizes that in the receiver two distinct waves are derived from the received wave (Trial Record 5397–5400).

103. Claim 8 requires that the waves from the separate paths shall be heterodyned with each other. That means that the waves shall be combined with each other in a nonlinear device such as a detector (Trial Record 4162–3, 5180–5, 5397–8).

104. Each of claims 9 and 10 requires that the currents from the separate paths shall be combined with each other in a detector. The requirement, when interpreted in accordance with Armstrong's use of the word "detector" in the specification, describes a heterodyning action at one or both of the detectors in the receiver and does not describe the combining of audio currents as disclosed in Armstrong's '447 patent (Trial Record 273–4, 291–2, 4246–7, 5186–9). During the prosecution of the '066 patent application, the Patent Office Examiner

questioned the use of the word "heterodyne" in the application, and in the amendment of October 26, 1931, Armstrong explained the operation as follows: "The combination of the two currents is effected in a balanced detecting device in which the heterodyne current is supplied differentially with respect to the signalling current so that the effect on one detector is additive while the effect on the other detector is subtractive." (Defendant's Exhibit D2, p. 23)

105. Claim 8 requires that there shall be a combination of reactance elements in one of the paths referred to therein.

106. Claim 9 requires that the two paths shall have different characteristics of transmission for the received frequency modulated wave. This claim 9 is read in the light of the specifications covering phase characteristics of the two paths. Claim 9 of the '066 patent includes the steps "passing the currents of all said frequencies through two paths having different characteristics of transmission for said currents and combining the output currents of these two paths in a detector to recreate the transmitted signal."

107. Claim 10 requires that in one of the paths the phase of the current shall be changed with respect to that of the current in the other path. Claim 10 of the '066 patent includes the steps "causing one of said paths to change the phase of the current passing therethrough with respect to that of the other, and combining the output currents of these two paths in a detector to recreate the transmitted signal."

108. Each of claims 8, 9 and 10 particularly points out and distinctly claims the synchronous heterodyne system and principle of operation for the detector circuit of a frequency modulation receiver. In the amendment filed October 26, 1931, in the '066 application, the solicitor of Armstrong stated (Defendant's Exhibit D2, p. 23): "The principal idea of the present case is to take the received wave and derive from it two currents, one of which is fed into a device which converts the variations in frequency into

variations of amplitude which is then combined with the other current of variable frequency and constant amplitude, the second current in this case acting as a synchronous or zero-beat heterodyne."

### The History of the Claims

109. The application as filed on July 30, 1930, contained *inter alia*, the following proposed claims:

(1) The step in the method of detecting frequency modulated waves which consists in subjecting a current derived from said waves to the heterodyning action of a second current also derived from said waves.

(3) In combination, a circuit for receiving frequency modulated waves, means for deriving from said waves a plurality of currents, and means for subjecting one of said currents to the heterodyning action of the other (Defendant's Exhibit 2).

The aforementioned original claims pointed broadly to the synchronous heterodyne principle for receiving a frequency modulated wave (without so denominating it).

110. Claims 8, 9 and 10 of the '066 patent here in suit were involved in an interference with an application for patent of Crosby, owned by RCA, having Serial No. 618,154, filed June 20, 1932, and which resulted in Crosby patent No. 2,229,640 (Plaintiff's Exhibits 22, 22A, 96). Claims 8, 9 and 10 of the '066 patent were introduced in the '066 application by amendment of March 18, 1933, as claims 12, 13 and 14 (Defendant's Exhibit D2, pages 49–52). Crosby patent 2,229,640, the application for which was in a patent interference with the '066 patent, describes a frequency modulation detector having two paths, each of which is separate and independent of the other as are the paths in the '066 patent.

111. In its final decision in the interference, on July 7, 1939, the Board of Appeals of the Patent Office defined the scope of claims 8, 9 and 10 here in suit as follows:

"The subject matter of the interference relates to a radio receiver for receiving frequency modulated waves. There are two paths provided, each capable of passing all of the frequencies of the received signal band and having different characteristics of transmission for the received signal. One set is subjected to the heterodyning action of the other and means responsive to the resulting current are arranged."

The Board of Appeals thereby affirmed that claims 8, 9 and 10 broadly cover the synchronous heterodyne principle for frequency modulation reception (Plaintiff's Exhibit 22, p. 1).

112. Crosby patent No. 2,229,640 and the application therefor in interference with the '066 patent disclosed several versions of a receiver embodying the synchronous heterodyne principle, including (1) circuits for a frequency modulation receiver in which a continuous variation in phase with frequency in one of the paths was produced (illustrated in Figs. 1 and 3a of the Crosby patent and by the Foster-Seeley discriminator later used by Motorola and others) and (2) circuits for a frequency modulation receiver in which a variation in amplitude in accordance with variations in frequency of the received wave was produced in one of the paths accompanied by a reversal in phase at the center frequency (illustrated in the Crosby patent in Fig. 3 and Fig. 1 when operated with an undamped or open circuit transmission line and in the '066 patent, Fig. 2, when the effective resistance in network 58, 59, 60 is zero) (Trial Record 4180–2; Plaintiff's Exhibit 96).

113. In the interference proceeding, RCA contended that it was entitled to the claims at issue because of the Crosby disclosure and that Armstrong was not entitled to such claims on the ground that the claims at issue were not supported by the disclosure of the '066 patent and particularly the disclosure relating to Fig. 2 thereof (Plaintiff's Exhibit 22, p. 3).

114. In rejecting the contention of RCA and in awarding priority to Armstrong on the subject matter of the interference, the Board of Appeals of the Patent Office held that the disclosure of the '066 patent adequately supported such claims, that Armstrong was the prior inventor of the synchronous heterodyne principle for frequency modulation reception and that he was entitled as against RCA to claims 8, 9 and 10 commensurate with the full scope thereof (Plaintiff's Exhibit 22).

## C. The Prior References Cited by Motorola

### Horton Patent No. 1,856,707

Filed March 28, 1928—Issued May 3, 1932

115. The Horton patent did not disclose a method or system for receiving and detecting frequency modulated waves (Trial Record 4147–8, 5189–90).

116. The Horton patent disclosed frequency measuring circuits (Defendant's Exhibit 7, Horton patent, p. 1, lines 1–13; Trial Record 2500–6, 2517–8, 4144–6, 5189–90).

117. The Horton patent did not expressly disclose anything about a frequency modulation receiver and stated nothing concerning the problem of detecting a wave which was dynamically varying in frequency (Trial Record 4147–8).

118. Heising testified that "Horton invented a measuring device for measuring the frequency * * * and it is to be expected that he meant measurement—measure a frequency which was not varying." (Trial Record 4144) The Horton patent did not specify whether or not the wave was varying in frequency.

119. To produce a useful result from the Horton circuits as specifically described, the primary circuit would be manually tuned to the frequency of the incoming wave and a reading of the frequency would be taken (Trial Record 2484–7, 4144–6).

120. The Horton patent did not disclose the synchronous heterodyne principle for frequency modulation reception and did not anticipate the '066 patent.

### Armstrong Patent No. 1,941,447

121. The '447 patent did not disclose two paths for the received wave leading to each detector (Trial Record 4246, 5189).

122. The '447 patent did not disclose a frequency modulation receiver in which the received wave was heterodyned with itself to provide currents which activate the detector to reproduce the signal (Trial Record 4246–7).

123. The '447 patent did not disclose the synchronous heterodyne principle for frequency modulation reception (Trial Record 4246–7, 5189).

### Usselman Patent No. 1,794,932

Filed Sept. 1, 1927—Issued Mar. 3, 1931

124. The Usselman patent disclosed a frequency modulation receiver but did not disclose two paths for the received wave leading to each detector (Trial Record 2860).

125. The Usselman patent did not disclose a frequency modulation receiver in which the received wave was heterodyned with itself to provide currents which activate each detector (Trial Record 2854–66).

126. The Usselman patent did not disclose the synchronous heterodyne principle for frequency modulation reception and did not anticipate the '066 patent.

### Hansell Patent No. 1,938,657

Filed Feb. 1, 1929—Issued Dec. 12, 1933

127. The Hansell patent related to a frequency modulation receiver but did not disclose two paths for the received wave leading to each detector (Trial Record 4159–60, 5390–1).

128. The Hansell patent did not disclose a frequency modulation receiver in

which the received wave was heterodyned with itself at the detector to reproduce the signal (Trial Record 4152–63, 5388–91).

129. The Hansell patent did not disclose the synchronous heterodyne principle for frequency modulation reception and did not anticipate the '066 patent (Trial Record 4152–63, 5388–91).

### Heising Patent No. 1,620,204

#### Filed Dec. 29, 1924—Issued Mar. 8, 1927

130. The Heising patent, like the Horton patent, disclosed a frequency measuring instrument (Trial Record 4164).

131. The Heising patent disclosed nothing about a frequency modulation receiver (Trial Record 4165).

132. The Heising patent did not disclose the synchronous heterodyne principle for frequency modulation reception and did not anticipate the '066 patent (Trial Record 4164–5).

### German Patent No. 428,643

#### Filed April 4, 1925—Issued May 14, 1926

133. The German patent relates to a frequency measuring instrument and discloses nothing which was not also disclosed in the Horton and Heising patents (Trial Record 4148–51). (It may be noted that Heising, Motorola's witness on the German patent, did not testify that the German patent disclosed anything about frequency modulation reception (Trial Record 2183–95). He was correct in not doing so. See Defendant's Exhibit 15.)

### Summary of Prior References

134. The prior references did not disclose singly or in combination, the synchronous heterodyne principle for frequency modulation reception and did not anticipate claims 8, 9 and 10 of the '066 patent.

## VII. ARMSTRONG REISSUE PATENT NO. 21,660

### A. The Disclosure

135. The Reissue patent disclosed how the signal-to-noise ratio in the wide band FM system could be increased by employing a particular and practical type and degree of pre-emphasis and de-emphasis and by substantially widening the detector circuits at the receiver in order to minimize distortion when pre-emphasis and de-emphasis are used (Trial Record 321–7, 2813–16, 4189–91, 4201, 4217, 5204–8, 5423).

136. The Reissue patent disclosed a particular characteristic for the pre-emphasis (predistortion of the signaling or audio frequencies at the transmitter) and gave specifications for the networks that might be used (Reissue patent, Figs. 3 and 16). The shape of the pre-emphasis was shown in Fig. 5 of the Reissue patent and results in amplification of modulating frequencies above about 10,000 cycles by about 10 times as compared with modulating frequencies in the region of 1,000 cycles (Pat. p. 2, col. 1, lines 7–17).

137. The particular pre-emphasis disclosed in the Reissue patent is in accord with the characteristic of a resistance-inductance network having a time constant of 75 microseconds (Trial Record 5204; Pat. p. 3, col. 2, lines 14–21).

138. The Reissue patent did not express the pre-emphasis characteristic in terms of a 75 microsecond time constant circuit, and there is no evidence that Armstrong was aware that it could be expressed in such cryptic and yet definite terms (Trial Record 5205). Everitt testified that during the trial he had found that the pre-emphasis characteristic could be approximated in mathematical terms by a complex exponential function (Trial Record 3346–7; Defendant's Exhibit 80A).

139. The pre-emphasis curve disclosed in the Reissue patent is such that audio frequencies below about 2,000 cycles are

not significantly predistorted (Defendant's Exhibit 80; Pat. Fig. 5; Trial Record 4201). Accordingly, the particular pre-emphasis disclosed in the patent is not only a matter of the degree or amount of predistortion of the audio frequencies, it also involves predistortion of a particular "shape" (Trial Record 5206, cf. 5204–5). The degree or amount and the shape of the pre-emphasis are shown in the Reissue patent in Figure 5. This is essentially the same pre-emphasis as that given by a simple resistance-inductance circuit having a time constant of 75 microseconds (Trial Record 5204–5).

140. The Reissue patent disclosed that distortion may occur at the receiver, particularly when the higher modulating frequencies at the transmitter have been accentuated by pre-emphasis (Pat. p. 1, col. 2, lines 20–34; p. 2, col. 1, line 40, to col. 2, line 37). That distortion was experienced in early FM broadcasting is evidenced by the reduction in pre-emphasis from 100 to 75 microsecond time constant to overcome it.

141. The Reissue patent disclosed that such distortion may result primarily from (1) lack of linearity of the detector characteristic and (2) destruction of the form of the higher modulating frequencies by cross-modulation with noise or by over-modulation (Pat. p. 2, col. 2, lines 19–37).

142. The Reissue patent disclosed that in the system described therein it is not necessary to lower the level of modulation and thereby lose signal-to-noise ratio in order to avoid such distortion (Pat. p. 3, col. 1, lines 23–34).

143. The Reissue patent disclosed that such distortion might be avoided by the particular expedient of widening the admittance band of the discriminator to such an extent that the over-modulation and cross-modulation illustrated in Figures 7 and 8 of the patent would not occur (Pat. p. 3, col. 1, lines 30–42).

144. The Reissue patent disclosed and provided specifications for restorer networks in the receiver to compensate for the particular pre-emphasis described for the transmitter (Pat. p. 3, col. 2, lines 22–27; Figs. 4 and 17).

B. State of the Art Before February 19, 1940—the Filing Date of the Reissue Patent—and Impact of Armstrong's Pre-emphasis and De-emphasis

145. Before 1940, it was not known (excluding Armstrong and his licensees) whether any kind of pre-emphasis and de-emphasis would provide a useful result in the wide band FM system or what kind or degree of pre-emphasis and de-emphasis would give an improvement (Trial Record 3959–60, 4244–5, 5206–8; Plaintiff's Exhibit 90, p. 7, col. 3).

146. The suggestion that the detector circuits should be widened substantially beyond the range of swing was contrary to prevailing engineering techniques (Trial Record 3961–6, 3999–4005, 4037–8).

147. Skilled engineers other than Armstrong had speculated that predistortion might be used in FM broadcasting but "guessed wrong" as to the form of predistortion which should be employed and made specific suggestions which, if adopted, might have degraded rather than improved the FM performance (Trial Record 4203–7, 4209–18, 4234–6, 5207–8).

148. In 1940, the Federal Communications Commission adopted pre-emphasis for FM broadcasting having the characteristics of a network with a time constant of 100 microseconds (Plaintiff's Exhibit 67, p. 4). In 1941, the Commission adopted the same pre-emphasis standard for television sound (Plaintiff's Exhibit 67, p. 9).

149. In 1945, and after field experience had shown that the 100 microsecond standard was not satisfactory, pre-emphasis with a time constant of 75 microseconds was, upon recommendation of the industry, adopted by the Federal Communications Commission for FM broadcasting and television sound (Trial Record 2810; Plaintiff's Exhibit 67, pp. 7 and 12). Such pre-emphasis at the

transmitter and corresponding de-emphasis at the receiver, specifically as disclosed in the Reissue patent (but expressed in other terms) are now in general use in those services.

### C.   The Claims and Their History
#### The Claims

150.   Each of the claims 1 and 2 requires that the high frequencies in the band of signaling frequencies shall be amplified to a substantially greater degree than the low frequencies in such band.   The meaning is that there shall be predistortion at the transmitter substantially as described in the specification (See Findings 136, 137, 138).

(Armstrong was deemed to be his own lexicographer and his claims are to be given a construction in accordance with the actual teaching of the patent.   Minneapolis-Honeywell Regulator Company v. Midwestern Instruments, Inc., 188 F. Supp. 248 (N.D.Ill.1960), aff'd 7 Cir., 298 F.2d 36.   As was said there by this court (188 F.Supp. p. 253), *mutatis mutandis*:

> "This is just another instance of a patentee's being his own 'lexicographer and an asserted infringer seeking refuge in a strained and strict construction of patentee's claim terminology."

Further authorities on the point are Flexwood Co. v. Faussner & Co., 145 F. 2d 528, 536 (7th Cir. 1944); Scherbatskoy v. United States Steel Corp., 287 F.2d 552, 556–557 (7th Cir. 1961); National Slug Rejectors v. A. B. T. Mfg. Corporation, 164 F.2d 333, 339 (7th Cir. 1947); W. F. & John Barnes Co. v. International Harvester Co., 51 F.Supp. 254, 324 (N.D.Ill.E.D.1943); Reynolds v. Whitin Machine Works, 167 F.2d 78, 85 (4th Cir. 1948); Westinghouse Electric & Mfg. Co. v. Quackenbush, 53 F.2d 632, 634 (6th Cir. 1931)).

151.   Each of claims 4 and 6 requires that the lower frequencies in the audio currents from the detector at the receiver shall be amplified to a substantially greater degree than the signaling currents of the higher frequencies.   The meaning is that the receiver shall include a restorer network which shall compensate for predistortion at the transmitter substantially in accordance with the characteristic described in the specification (Pat. p. 4, col. 1, line 32 to col. 2, line 2; col. 2, lines 30–32).

152.   Claim 1 requires that the transmitted wave shall comprise a wide band of frequency variations (p. 3, col. 2, lines 38–40).   Claim 2 requires means for varying the carrier wave over a wide range (p. 3, col. 2, lines 61–62).   The meaning is that the transmitted wave shall be a wide swing wave as described in the '069 patent and then on the air from Major Armstrong's Alpine Station.

153.   Each of claims 4 and 6 refers to the wide swing of the received wave (p. 4, col. 1, lines 24–25).   The meaning is that the receiver shall be a wide band receiver as disclosed in the '069 patent and as employed by Major Armstrong and others in receiving transmissions from the Alpine Station and other experimental FM stations then on the air.

154.   Claim 1 requires that the detecting device shall have an admittance band substantially wider than said wide band of frequency variations.   The meaning is that the discriminator and detector circuits shall be substantially widened as compared with the peak-to-peak swing and thereby avoid the distortion described in the specification (Plaintiff's Exhibit 21, pp. 6, 11–12).

155.   Claim 2 requires that the discriminator shall have an admittance bandwidth substantially greater than the width of the said wide range of carrier frequencies (p. 3, col. 2, lines 65–70). The meaning is that the discriminator shall have an admittance band substantially greater than the peak-to-peak swing of the signal in accordance with the teaching of the specification and thereby avoid the distortion disclosed in the specification (Plaintiff's Exhibit 21, pp. 6, 11–12).

156.   Each of claims 4 and 6 requires that the discriminator or the detecting

device shall have an admittance band substantially greater or wider than the width of the wide swing of the received wave. The meaning is that the admittance band of the discriminator shall be made substantially greater than the peak-to-peak swing of the received wave in accordance with the teaching of the specification and thereby avoid the distortion referred to in the specification (Plaintiff's Exhibit 21, pp. 6, 11-12; Trial Record 5423).

157. The words "substantially greater" or "substantially wider" appearing in claims 1, 2, 4 and 6 of the Reissue patent with respect to the admittance band emphasize that the greater width of the admittance band is of significance in the combination and not merely trivial or incidental (Plaintiff's Exhibit 21, p. 6).

The History of the Claims

158. Claims 1, 2, 4 and 6 here in suit and the other claims of the Reissue patent were involved in an interference proceeding in the United States Patent Office with an application of Hansell, owned by RCA, having Serial No. 297,777, and which issued as Hansell patent No. 2,465,-448 on March 29, 1949 (Plaintiff's Exhibits 21 and 99).

159. The Hansell '448 patent disclosed a system of predistortion in which the modulating frequencies below 3,000 cycles would be amplified to a greater extent than the higher modulating frequencies from 5,000 to 10,000 (Trial Record 4232; Plaintiff's Exhibit 99, Fig. 2). The Hansell '448 patent made specific reference to Usselman patent No. 1,794,-932 and Crosby patent No. 2,071,113, both of which have been cited herein as references against the Reissue patent (Plaintiff's Exhibit 99).

160. The system of predistortion disclosed in the Hansell patent would be inoperative and is not used in FM broadcasting (Trial Record 4234, 5207-8).

161. The Board of Interference Examiners did not believe that the Hansell application disclosed a form of predistortion covered by the claims of the Reissue patent (Plaintiff's Exhibit 21, pp. 10-11).

162. The Board of Interference Examiners held that the Hansell application, and specifically the Usselman and Crosby patents referred to therein, had not disclosed the substantially wider admittance band and its particular function as disclosed and claimed in the Reissue patent (Plaintiff's Exhibit 21, pp. 11-14).

163. The Board of Interference Examiners found that Armstrong's proofs were persuasive that he had first used the pre-emphasis and de-emphasis system disclosed in the Reissue patent as early as 1936 but did not hold that Armstrong had reduced the system to practice in 1936 because of the rule requiring independent corroboration which applies in interference proceedings (Plaintiff's Exhibit 21, p. 20).

164. The only change in the specification of the Reissue patent as compared with the specification of the original patent No. 2,215,284 was the correction of the following palpable error in language: On page 1 of the Reissue patent, column 2, lines 31-32, the words "improvement in both the fidelity and signal to noise ratio" were substituted for the words "increase in both the fidelity and noise level" which appeared in the original patent (Defendant's Exhibit 4).

165. The only change in the claims of the Reissue patent as compared with the claims in original patent No. 2,215,284 is that claims 4, 5 and 6 appear in the Reissue and do not appear in the original patent No. 2,215,284 (Defendant's Exhibit 4).

166. Claims 4, 5 and 6 of the Reissue patent point out the same elements of a frequency modulation receiver and method of receiving frequency modulated waves as are pointed out in claims 1, 2 and 3 of the Reissue patent.

167. The only difference between claims 1, 2 and 3 of the Reissue patent as compared with claims 4, 5 and 6 thereof is that claims 1, 2 and 3 cover a transmitter and receiver in combination (claims 2 and 3) or a method of trans-

mitting and receiving (claim 1), whereas claims 4, 5 and 6 cover a receiver (claims 4 and 5, or a method of reception (claim 6), for receiving a frequency modulated wave which has been predistorted as provided in claims 1, 2 and 3.

168. The Board of Interference Examiners found that claims 4 to 6 are "drawn to the same invention" as claims 1 to 3 (Plaintiff's Exhibit 21, p. 11).

### D. The Prior References Cited by Motorola

#### Bown Patent No. 2,212,338

#### Filed Apr. 28, 1938—Issued Aug. 20, 1940

169. The Bown patent expressly suggested a type of predistortion in which the higher frequencies were to be accentuated as compared with the lower frequencies at a rate higher than the increase of absolute frequency (Defendant's Exhibit 7, Bown patent, p. 3, col. 1, lines 26–34; Trial Record 4205–6, 5206).

170. Predistortion as specifically suggested in the Bown patent would not be practical (Trial Record 4211, 5207).

171. The Bown patent does not indicate that any actual experiments or tests of predistortion with frequency modulation apparatus had been made by Bown (Trial Record 1840, 4208).

172. The Bown patent did not refer to the problem of distortion at the receiver or suggest any solution for such distortion (Trial Record 4206).

173. The Bown patent did not disclose the particular system of pre-emphasis and de-emphasis disclosed in the Reissue patent; nor were circuits of any sort or other means for providing the pre-emphasis and de-emphasis disclosed. The degree of emphasis taught by the Bown patent, as usually interpreted would result in an excessive degree of emphasis whereas the illustration in the Armstrong Reissue has proven to be the best and is that which is now used. The Bown patent did not anticipate the Reissue patent.

#### Inaugural Address of Alan Hazeltine January 8, 1936

174. Professor Hazeltine, in his January, 1936, inaugural address as President of the Institute of Radio Engineers, praised the then latest work of Major Armstrong on frequency modulation and accepted his teachings as valid (Defendant's Exhibit 7, Hazeltine article).

175. Professor Hazeltine raised the speculation whether predistortion and restoration might be usefully employed in the frequency modulation system with which Major Armstrong was working (Hazeltine article, supra).

176. Professor Hazeltine suggested that to provide such predistortion the condenser-resistance inverting network might be taken out of Armstrong's phase-shift transmitter (disclosed in '068 and '069 patents) and placed in the receiver (Hazeltine article, supra, p. 141).

177. Predistortion as suggested by Professor Hazeltine would result in an accentuation of the higher frequencies as compared with the lower frequencies in the signal at a rate equal to the increase in absolute frequency (Trial Record 4203–4).

178. Such predistortion for a broadcast service would result either in reduction of the service area or in distorted reception (Trial Record 4204). Results are so dependent on details of circuits that unequivocal conclusions are difficult to draw. In general, distortion would result.

179. Professor Hazeltine did not suggest the particular system of pre-emphasis and de-emphasis disclosed in the Reissue patent and did not anticipate the Reissue patent.

#### Usselman Patent No. 1,794,932

#### Filed Sept. 1, 1927—Issued Mar. 3, 1931

180. The Usselman patent disclosed no type of predistortion and restoration and related to *narrow band* frequency modulation circuits (Trial Record 4225–6, 1779).

181. In respect to the Reissue patent disclosure the Usselman patent cannot be deemed to refer to the problem of distortion in a frequency modulation receiver and no solution for that problem was disclosed (Defendant's Exhibit 7, Usselman patent), although it does refer to correction of nonlinearities in the detector and in this sense to reduction in distortion.

182. The curve for detector circuits disclosed in the Usselman patent was not quantitatively accurate (Trial Record 1775, 4226).

183. The Usselman patent did not indicate that the detector circuits should be appreciably widened beyond the range of swing (Trial Record 2812–3; Plaintiff's Exhibit 21, pp. 11–18).

184. The Usselman patent did not anticipate the Reissue patent.

### Crosby Patent No. 2,071,113

### Filed Oct. 17, 1935—Issued Feb. 16, 1937

185. The Crosby patent did not suggest the use of any kind of predistortion and restoration in a frequency modulation system (Trial Record 4225).

186. The Crosby patent did not disclose that the detector circuits should be appreciably widened beyond the range of swing (Trial Record 2812–3, 4222).

187. The Crosby patent did not anticipate the Reissue patent.

### The Fyler and Worcester Article

188. In 1939, Messrs. Fyler and Worcester were employed by the General Electric Company (Plaintiff's Exhibit 50). Pre-emphasis was then in experimental use at the Alpine Station (Trial Record 4411–3).

189. In 1938, the General Electric Company had delivered certain receivers to Major Armstrong which had been custom-built by the General Electric Company on the order of Major Armstrong. Those receivers were designed for reception of frequency modulation signals from the Alpine Station and the stations of the Yankee Network. Those receivers included de-emphasis circuits to compensate for the pre-emphasis then being employed by Major Armstrong in his experimental transmissions (Trial Record 709–11, 4413).

190. There is no evidence that Messrs. Fyler and Worcester published anything in the article of July, 1939, concerning the use or characteristics of a restorer network and the proper bandwidths for circuits in the receiver, including the discriminator, except such information as had been derived by the General Electric Company from Major Armstrong.

### Summary of Prior References

191. None of the foregoing prior references disclosed the particular characteristic for predistortion and restoration which was disclosed in the Reissue patent.

192. None of the prior references taught the use of a discriminator with an admittance band or operating range substantially wider than the peak-to-peak swing.

193. None of the prior references stated anything about the problem of distortion at the receiver if predistortion and restoration were employed.

194. Armstrong found that in FM distortion can be prevented by proper receiver design, i. e., by increasing the bandwidth of the receiver circuits, especially the detector circuits, with practically no adverse effect on noise reduction. This was new and original with Armstrong. In the Reissue patent, Armstrong is not describing a large increase in bandwidth, as was the case in '069, but proposed only a modest increase. Armstrong chose a degree of emphasis as given in the Reissue patent, and subsequently proved correct in practice, which was practical when employed with a practical amount of widening of FM receiver circuit bandwidths. The choice of a particular degree of emphasis and a corresponding amount of bandwidth constitute invention, as these values could not have been predicted in the late 1930s (Trial Record 3959–3966, 3999–

4005). The really significant invention of distortion prevention in FM was through proper design of the receiver. The Reissue taught that the distortion could be prevented by increasing the bandwidth of the receiver detector circuits. Armstrong's invention was in discovering that the distortion resulting from the use of emphasis could be prevented in FM at the receiver; then the task of determining the degree was one of merely good sense or good design. It was invention, at that time, to determine that this method of preventing distortion was possible. This conclusion is fortified by the language of the claims which all contain the statement regarding increasing the admittance bandwidth of the receiver detector whereby distortions are minimized. None of the prior references disclosed the particular degree of pre-emphasis and de-emphasis disclosed in the Reissue patent, which degree has proven to be most satisfactory; neither did any prior reference disclose the necessity for adequately wide detector circuits in the receiver to eliminate distortion otherwise accompanying pre-emphasis and de-emphasis; neither did any prior reference suggest that anything could be done at the receiver (other than the conventional use of de-emphasis circuits) to eliminate distortion resulting from the use of pre-emphasis at the transmitter

## VIII. ADOPTION AND USE OF THE WIDE BAND FM SYSTEM

195. Plaintiff put in evidence, testimony of Edwin H. Armstrong before the FCC at hearings on June 17, 1936 (Plaintiff's Exhibit 37), and on March 18 and 19, 1940 (Plaintiff's Exhibit 53). The 1936 hearings were for the purpose of considering the needs of various services for frequencies above 30,000 kilocycles. The 1940 hearings were to consider requests for FM broadcast stations on such frequencies so as to render a program service to the public, and were for the purpose of determining the relative merits of FM as a proposed broadcasting service at such frequencies and AM as the existing service. At each such hearing Armstrong testified and played recordings purportedly to demonstrate the advantages of FM over AM for radio broadcasting, particularly with relation to the effect thereon of static, fading, and man-made disturbances such as ignition noises. Both hearings were subsequent to the issuance on December 26, 1933, of the Armstrong '066 and '069 patents here in issue, but prior to the issuance of the Reissue patent.

196. In June, 1936, Major Armstrong informed the Federal Communications Commission concerning the wide band FM system and recommended that the Commission provide for its use for a new broadcasting service on the very high frequencies (Plaintiff's Exhibit 37; Trial Record 796–810).

197. At the hearing before the Federal Communications Commission, Major Armstrong played recordings to demonstrate the performance of the FM system as compared with the performance of amplitude modulation at the same frequency and power and with the performance of a short wave AM station then being operated by Columbia Broadcasting System. At the hearing, Major Armstrong also played a recording to demonstrate the performance of the wide band FM system at a distance of about 85 miles between the receiver and the transmitter (2 kilowatts) as compared with the reception on the standard broadcast band through summer static over substantially the same distance from the 50 kilowatt clear channel Station WEAF operated by the National Broadcasting Company (Trial Record 796–810).

198. The Court heard those recordings and finds that they strikingly demonstrated the improvement in radio signaling that could be provided by the wide band FM system in 1936 when compared with reception by amplitude modulation under severe conditions of noise and interference (Trial Record 5135–9).

199. In 1936, the Federal Communications Commission authorized experi-

mental broadcasting with FM on a channel of 200 kilocycles and at the same time authorized experimental short wave broadcasting by amplitude modulation on a channel of 30 kilocycles (Trial Record 699; Plaintiff's Exhibit 67). At that time, there were no frequency modulation receivers on the market (Trial Record 702).

200. In 1936, Major Armstrong began the construction of a high power FM station at Alpine, New Jersey. The station, with call letters W2XMN, went on the air in 1938 and was the first high power FM broadcasting station in operation in this country and in the world (Trial Record 705–6).

201. In the period from 1937 to 1940, the Yankee Network built and installed FM stations operating in a channel of 200 kilocycles width on the top of Mt. Washington and Mt. Asnebumskit (Trial Record 700–10).

202. In 1939, the General Electric Company offered for sale the first commercial FM receiver capable of receiving FM transmissions from the Alpine Station of Major Armstrong and the FM stations of the Yankee Network (Trial Record 710–11, 731–33).

203. In the magazine "Broadcasting" —April 1, 1940, issue (Plaintiff's Exhibit 55) reporting on the FCC hearings of March 18–28, 1940, the testimony of John Shepard III, president of FM Broadcasters, was referred to, and the article stated that (p. 18, 4th col.) "he saw FM replacing AM and operators using only FM transmitters in many areas after a transition of 'roughly 10 years,' during which the AM audience would tend to shrink as the FM audience increased."

204. The number of broadcasting stations in use, and the number of receivers sold are measures of the FM and AM audiences. The facts are that the AM radio receiver audience increased by some 88 million receivers in those 10 years while the FM radio receiver audience was represented in only 6,226,-000 receivers, and the number of FCC licensed FM radio broadcast stations increased from 0 to 493 in 1950 (Defendant's Exhibit D88), while the number of FCC licensed AM radio broadcast stations increased from 765 in 1940 to 2118 in 1950. Seventeen years later in 1957, the respective numbers were equally disproportional for there were 519 licensed FM stations to 3044 licensed AM stations (Defendant's Exhibit D88).

205. In that same period the cumulative retail sales of radio receivers for the period were (Defendant's Exhibit D 89):

| FM Radio Receivers | | AM Radio Receivers |
|---|---|---|
| 1940 | | 12,200,000 |
| 1950 | 6,226,000 | 100,100,000 |
| 1957 | 9,562,000 | 182,200,000 |

206. However, it should be additionally noted that (1) all television sound was and is FM rather than AM; (2) since 1940, all short wave broadcasting was and is FM rather than AM (Motorola's cumulative sales figures for AM relate only to standard broadcasting from 500 to 1500 kilocycles and not the short wave bands); (3) essentially all of the police and other communication services were and are FM rather than AM (Trial Record 3699), and (4) the United States Armed Forces adopted and made use of FM.

207. The Motorola FM broadcast receivers of Plaintiff's Exhibits 25 and 26 are combined AM and FM receivers (Trial Record 1072, 1470, 1471) and all radio receivers manufactured and sold by Motorola during the period from 1940–1953 for receiving FM broadcast signals were combined AM and FM receivers. During this period, there were many more AM programs and many more AM broadcasting stations than for FM, and Motorola's customers wanted receivers which would receive both AM and FM programs (Trial Record 1022, 1065, 1066). Motorola discontinued the manufacture and sale of radio receivers for receiving FM broadcast signals during the period 1953 to 1957 because the public interest in FM waned and there was not an adequate

market for such receivers (Trial Record 1064, 1065).

208. In March, 1940, the Federal Communications Commission held a public hearing to determine whether FM broadcasting should be authorized as a public service and to fix the standards for such a service (Plaintiff's Exhibits 53, 54, 55). In May, 1940, the Federal Communications Commission authorized FM broadcasting as a public service and fixed the standards therefor, including a channel width of 200 kilocycles and a peak-to-peak swing of 150 kilocycles for full modulation on peaks of frequent recurrence (Plaintiff's Exhibit 68, and see Plaintiff's Exhibit 67). Such standards were in accordance with the recommendations of FM Broadcasters Incorporated and reflected the consensus of radio manufacturers and others interested in establishing a new broadcasting service (Plaintiff's Exhibits 51, 54, 55, 68, and Trial Record 744–46).

209. Armstrong in his testimony before the FCC in March, 1940, was asked:

"And when was information on this invention first made available to the public?"

and he answered:

"I presented a paper before the Institute of Radio Engineers in New York City in November of 1935. The paper was published in the May, 1936, issue of the proceedings, volume 24, No. 5, pages 689 to 740. I testified here in the June, 1936, hearing here before the Commission relative to the allocation of the ultra high frequencies."

(Plaintiff's Exhibit 53, p. 44, Plaintiff's Exhibit 24). In December, 1948, after FM broadcasting and television broadcasting, and FM two-way systems were in commercial use Armstrong published a statement (Plaintiff's Exhibit 13) wherein he said:

"Patent No. 1,941,069 covers the basic 'wide-swing' FM invention. The theory and manner of operation of that invention were fully explained to the engineering profession in a paper entitled 'A method of Reducing Disturbances in Radio Signalling by a System of Frequency Modulation,' which I read before the Institute of Radio Engineers on November 6, 1935."

210. Plaintiff's witness Heising testified that he had been employed by Western Electric Company and the associated Bell Telephone Laboratories over the period from 1914 to 1953, that in 1933 or 1934 he authorized a group of engineers to carry on work on frequency modulation and that he did not then know that the '069 patent had been issued (Trial Record 4075, 4548), and that he first heard of the work of Armstrong when Armstrong made his announcement in the paper in 1935 (Trial Record 4101). The material disclosed in '069 and '066, and particularly in '069, is the same as that in Armstrong's IRE paper, which had a profound effect on radio engineering and on the radio industry. Likewise, Armstrong's work on pre-emphasis (Reissue) had a significant effect on the industry.

211. Plaintiff has introduced in evidence the paper given by Armstrong before an IRE meeting in New York on November 6, 1935, and published in the Proceedings of the IRE in May, 1936 (Plaintiff's Exhibit 24), describing an FM system (Trial Record 691, 692). This paper was presented and published more than two years after the '069 application was filed, and after the '069 patent issued on December 26, 1933, and does not identify the '069 patent. Armstrong's patents described the structural and operating characteristics of the wide band FM system and Major Armstrong described those characteristics again in his IRE paper and reported upon the performance that he had achieved under field conditions. It was his report and demonstrations of performance under actual operating conditions that "stunned the art" (Trial Record 834), and he could not have included such a report in the '069 patent because he had not yet done it. He had the inventive concept; he knew how his apparatus should

be built and he had confirmed the performance in his laboratory ('069 pat., p. 3, lines 133-9), but he had not yet proved it in the field and the art would not believe until the signals over great distances could actually be listened to. As Paul de Mars testified, the steps that had to be taken to inform and convince the industry attest to the revolutionary nature of Armstrong's invention (Trial Record 843-6). There is a similar situation in connection with the Reissue patent. Major Armstrong convinced the engineering profession of the advantages of his pre-emphasis and de-emphasis for FM broadcasting and proved those advantages by the performance of his Alpine Station and the General Electric receivers that he employed in his demonstrations.

212. In May, 1940, the Federal Communications Commission, in referring to the frequency modulation system which had been disclosed to it by Major Armstrong and in deciding that such frequency modulation would be employed in a new service for the public, stated: *"The Commission believes that this is one of the most significant advances that has been made in aural broadcasting in recent years."* (Italics supplied.) (Plaintiff's Exhibit 68, p. 1.)

213. In March, 1941, the Federal Communications Commission authorized television as a public service and provided that the sound transmission in television broadcasting would be in accordance with the FM system which had been previously authorized for FM broadcasting (Plaintiff's Exhibit 69, and see Plaintiff's Exhibit 67). In taking such action on television sound, the Commission adopted the recommendations of the National Television System Committee which represented radio receiver manufacturers and others interested in the establishment of a television service and had been organized for the purpose of securing a consensus in the industry on which the Commission might act (Plaintiff's Exhibit 147; Trial Record 4016, 2764-7, 5122-34, 5288-91). The Commission, in authorizing frequency modulation for sound accompanying the pictures, stated that television was thereby benefited by the recent development of frequency modulation (Plaintiff's Exhibit 69, p. 4).

214. Armstrong appeared as a guest at a meeting of Panels 5 and 6 of the National Television System Committee (hereinafter referred to as NTSC) on December 20, 1940 (Plaintiff's Exhibit 147). There is no evidence that these Panels nor that NTSC in its ultimate report to the FCC considered or interpreted the '066, '069, and Reissue patents here in issue, and Chairman Cummings for the meeting specifically invited Armstrong's "attention to the fact that the Panels were instructed to neglect patents, royalties, etc., and to arrive at conclusions based on sound technical considerations." Plaintiff's Exhibit 69, comprising a report of the FCC on the March 20, 1941, television hearing before the Commission, refers to the proceedings of the NTSC as being an extensive study represented in eleven volumes (p. 2). The report makes no reference to Armstrong nor to his patents. The NTSC adopted wide band FM for the television sound channel on the basis of its technical merit, without regard to patent rights.

215. In May, 1945, the Federal Communications Commission decided that the FM broadcast service should be moved from the frequencies previously allocated to it (42 to 50 megacycles) to the frequencies from 88 to 108 megacycles. That change in frequencies made obsolete all frequency modulation receivers constructed before the war (Trial Record 1048, 1059, 1062-64, 1664-65).

216. In November, 1945, the Federal Communications Commission changed the standards for television broadcasting and provided that the sound transmission would be by frequency modulation with a peak-to-peak swing of 50 kilocycles instead of the peak-to-peak swing of 150 kilocycles which had been previously authorized (Plaintiff's Exhibit 67). The Commission made this change upon the recommendation of the Radio Technical

Planning Board, an industrywide association organized to formulate plans and recommendations for post-war radio services (Trial Record 4016–27). The Board, reflecting the consensus of the industry, desired that the noise-reducing properties of FM should be retained for television sound but feared that receiver manufacturers might have a problem in providing adequate oscillator stability in television sound receivers if the swing were greater than 50 kilocycles (Trial Record 2764–67, 4016–27).

217. The evidence shows that over the period from 1941 through 1957 with respect to FM radio broadcasting, television broadcasting with FM sound, and two-way mobile FM radio telephone communication services:

  (1) Radio signals for each of said three types of services could be generated and transmitted only with the authorization and license from the FCC.

  (2) Motorola had no license from the FCC to produce and transmit FM radio or TV radio signals in broadcasting service for the reception and reproduction thereof in FM radio broadcast receivers, and in television receivers.

  (3) Motorola had no corporate connection directly or indirectly either itself or through the purchaser of Motorola receivers in issue, with a broadcaster of FM radio signals, or with a broadcaster of television signals with FM radio sound, nor any control over such a broadcaster.

  (4) Motorola did not manufacture or sell, either directly or indirectly, FM radio broadcast transmitters, or TV transmitting equipment employing FM sound.

  (5) Motorola manufactured and sold transmitters for voice communication in two-way mobile radio telephone systems, for which the Motorola customer had to obtain a license from the FCC.

(Trial Record 1450–53, 1532–34, 1949–53, 2146–51, 2296–97.)

218. As for its FM broadcast and television sound receivers, Motorola could have employed an off-tuned AM set, as was suggested by Dean Everitt in the edition of his text on *Communication Engineering* in 1937 (Trial Record 3100–04). In that event, the Motorola receivers might have picked up and reproduced the signal but there would have been no noise suppression, no utilization of Armstrong's teaching and Motorola could not have truthfully advertised and sold its sets as giving "noise-free FM reception."

219. As for Motorola's FM communication equipment, the Commission did not require Motorola to build it with a deviation ratio of 5 and so as to provide "noise quieting" action in the receivers (Trial Record 4480–83). The Commission specified only that the equipment must operate within a channel of 40 kilocycles (Trial Record 3008–9). Motorola decided that it would sell the best equipment that it could possibly build for operation in such channels and desired that its equipment not be inferior in operation or performance to that of its competitors and be compatible with such competitive equipment.

220. In the FM broadcast service, the reduction in noise at the output of a properly designed receiver as compared with the noise from a comparable amplitude modulation system operating at the same power and at the same frequencies is readily apparent to the listener (Plaintiff's Exhibits 90, 91, 92).

221. In the television sound service, the reduction in noise at the output of a properly designed receiver as compared with the noise from an amplitude modulation receiver at the same frequency and same power is readily apparent to the listener at many locations and under many conditions in which the service is provided (Trial Record 2764–67, 4016–25).

222. Short wave broadcasting by amplitude modulation was in operation in the United States on an experimental basis before World War II. Such broad-

casting has been abandoned (Plaintiff's Exhibit 74; Trial Record 982–5, 991).

223. In the police services, frequency modulation with a peak-to-peak swing of 30 kilocycles to transmit an audible frequency range up to and not greater than 3,000 cycles has been in wide use in the United States. Such apparatus is an application of the wide band FM system (Trial Record 5155).

224. During World War II the United States Armed Forces adopted and made use of wide band FM apparatus for mobile communication purposes substantially similar to FM police apparatus with respect to bandwidth and noise reducing properties (Trial Record 2276–78, 3015–16).

225. Plaintiff introduced in evidence as Exhibits 14, 15 and 16, collections of patent licenses granted by Edwin H. Armstrong in connection respectively, with broadcast transmitters, broadcast receiving sets, and mobile and miscellaneous communication equipment, and lists of all licensees to whom such licenses were granted. Each of the identified license agreements in all three Exhibits included a license under from fifteen (15) to twenty-five (25) United States FM patents therein listed (Defendant's Exhibit D64), except as to the licenses to Western Union Telegraph Company of September 27, 1945, and January 1, 1949, in the mobile and miscellaneous communication group (Plaintiff's Exhibit 16), which identified twenty-six (26) patents including No. 1,941,447 (the '447 patent). The licenses of said three Exhibits were issued at different dates in said period 1939–1950. Licenses included in Plaintiff's Exhibits 15 and 16 provided for termination on December 26, or December 31, 1950, with the right in the licensee to renew for successive periods of three years thereafter, or in some instances, for the life of the last to expire FM patent of licensor. As indicated in the tabulation of licenses in Plaintiff's Exhibits 15 and 16, thirty-four (34) of the total of forty-one (41) licenses did terminate on one or the other

date (Defendant's Exhibit D65, D66), and such licensees did not avail themselves of the privilege to renew. Failure to renew licenses could be attributed to the fact that licensees would be reluctant to extend their licenses when there were allegedly powerful and flagrant infringers who paid no royalties.

226. As of March, 1941 (Plaintiff's Exhibits 17, 18, 19 and 20), Armstrong waived all royalties from then existing licensees for systems of apparatus purchased by the Government for national defense or other military purposes, and granted a royalty-free license to the Government. The identified exhibits show that Armstrong offered, upon request of the Government, to grant to a manufacturer designated by the Government a license under his patents to manufacture such apparatus for such purposes at a royalty basis of one dollar ($1.00) per year, and such Exhibits show that the waiver of royalties and such offer to the Government to license manufacturers were to continue for so long thereafter as the then national and international emergency existed. Such emergency existed at least to October 1, 1945.

227. During all of World War II, Motorola developed, manufactured and sold to the United States Government a large quantity of FM radio communication equipments for military use (Trial Record 3591, 3595; Defendant's Exhibit D92). Such fact was well publicized by Motorola (Trial Record 3594; Defendant's Exhibit D51; FM and Television of October, 1944, September, 1945). The Government did not designate Motorola for a license under the Armstrong patents.

228. The following companies had licenses under the frequency modulation patents owned by Major Armstrong and paid royalties to him in connection with their manufacture and sale of FM broadcast receivers and television receivers (Plaintiff's Exhibit 15):

Airadio, Incorporated
Ansley Radio Corporation
Browning Laboratories, Inc.

**364**

Collins Audio Products Company, Inc.
Espey Manufacturing Company, Inc.
Fisher Radio Corporation
Freed Radio Corporation
General Electric Company
The Hallicrafters Company
Howard Radio Company
Meissner Manufacturing Division
(Maguire Industries, Incorporated)
Minerva Corporation of America
North American Philips Company, Inc.
Pilot Radio Corporation
Radio Engineering Laboratories, Inc.
Scott Radio Laboratories, Inc.
Stewart-Warner Corporation
Stromberg-Carlson Company
Templetone Radio Manufacturing
Corporation
Westinghouse Electric Corporation
Wilcox-Gay Corporation
Zenith Radio Corporation

229. Major Armstrong also granted licenses to the operators of more than 300 FM broadcast stations. Each of the licenses provided that the broadcaster would have the right to make or have made and to operate an FM broadcast transmitter for the transmission of programs to the general public, and required the broadcaster to pay a lump sum royalty based upon the operating power of the transmitter as initially installed and to pay an additional royalty in the event that the broadcaster should later increase the operating power of the transmitter. The schedule of royalties provided for in each license ranged from $150 for an operating power of 250 watts to $2,500 for an operating power of 50 kilowatts. Each of the licenses expressly provided that no license for reception was granted except for purposes of monitoring the operation of the FM broadcast transmitter (Plaintiff's Exhibit 14).

230. Major Armstrong granted licenses under his frequency modulation patents to manufacturers of apparatus for police radio communication and for other mobile and miscellaneous purposes. After World War II the following com-

panies had such licenses (Plaintiff's Exhibit 16):

Cover Dual Signal Systems, Inc.
Doolittle Radio, Inc.
Finch Telecommunications, Inc.
Freed Radio Corporation
General Electric Company
The Hallicrafters Company
Howard Radio Company
Fred M. Link (an individual)
Radio Engineering Laboratories, Inc.
Western Electric Company, Inc.
The Western Union Telegraph Company
Westinghouse Electric Corporation

231. Major Armstrong granted a license under his frequency modulation patents to The Western Union Telegraph Company for public service communication, namely, in radio communication service in which tolls are charged to the public for messages transmitted by the operator of the service (Plaintiff's Exhibit 16).

232. In the period from 1938 to 1953, Major Armstrong received royalties from his licenses in the aggregate amount of about $4,475,000, of which about $3,713,000 was paid in connection with the manufacture and sale of FM broadcast receivers and television receivers, about $168,000 was paid by the operators of FM broadcast transmitters and about $593,000 was paid in connection with the manufacture of apparatus for police radio communication and other mobile and miscellaneous communication purposes, including public service communication by Western Union Telegraph Company (Plaintiff's Exhibits 14, 15, 16).

IX. INFRINGEMENT BY MOTOROLA OF PATENT NO. 1,941,069

233. Motorola interrogatories to plaintiff and plaintiff's answers thereto are embodied in a stipulation between the parties and in evidence as Defendant's Exhibit D70. In answer to interrogatories concerning Armstrong's knowledge of the three types of Motorola's FM apparatus as charged here to

infringe the three patents in issue, as of the period prior to January 6, 1954, when the present suit was filed, plaintiff answered (Defendant's Exhibit D70, p. 7):

"For purposes of this case, you may take it as a fact that Major Armstrong had knowledge of Motorola's FM radio communication equipment, television broadcast receivers and FM broadcast receivers and believed that such apparatus infringed the patents in suit as charged herein at a time which was reasonably promptly after each such type of apparatus appeared on the market, namely, within a period of a few months."

In answer to interrogatories as to whether Armstrong examined such Motorola apparatus prior to sending the notice of infringement dated December 20, 1948 (Plaintiff's Exhibit 12), plaintiff answered (Defendant's Exhibit D70, p. 7):

"We do not have information as to whether Major Armstrong actually examined Motorola's 'apparatus.' I know from personal knowledge, however, that Major Armstrong examined published circuit diagrams of Motorola's apparatus, although I cannot say now and have no record of precisely which circuit diagrams they were. You may take it for granted, however, that Major Armstrong was familiar with the characteristics of Motorola's equipment so far as they are pertinent to the infringement issues in this case."

In answer to an interrogatory as to whether Armstrong in the period January 1, 1940–January 6, 1954, attempted to keep abreast of products corresponding to the three types in issue here as manufactured by members of the electronic industry, plaintiff answered (Defendant's Exhibit D70, p. 9):

"The answer is yes."

234. George MacDonald who testified on behalf of Motorola on the laches issue, was in the employ of Motorola from May, 1934, until his resignation and retirement on January 1, 1952, was made assistant to the Comptroller in 1940, Treasurer in 1942, Vice President in Charge of Finance in 1948, and was a director of the corporation from 1942 to May of 1954 and a stockholder during that time and to date. Paul V. Galvin, president of Motorola in 1939 made MacDonald responsible in that year for serving as liaison between patent counsel Mueller and the company, and he served in that capacity from 1939 to the time of his resignation. In that capacity he kept informed (Trial Record 3724, 3725) of all legal matters concerning patents and licenses so as to be in a position to acquaint Mr. Galvin with the status of such matters when it was not convenient for him to consult directly with outside patent counsel (Trial Record 3521–3525).

235. Mr. Galvin, as founder of Motorola was the chief executive officer from the time of its incorporation in 1928 until his illness and subsequent death on November 5, 1959. MacDonald testified that Mr. Galvin maintained a deep interest in the developments within the industry, in the engineering departments of the corporation, in the patent problems at Motorola, and made all final decisions as to patent infringement and patent license questions (Trial Record 3529, 3530).

236. On June 24, 1946 (Defendant's Exhibit D48), Motorola patent counsel wrote G. W. Merwin, Patent License Agent of Western Electric after learning of the Armstrong license referred to in Finding 238, advising that Motorola knew nothing of the negotiations for such a license nor of the license itself until after it had been executed, and reiterating Motorola's position that its FM communication equipment did not infringe any valid Armstrong patent.

237. Motorola's position of noninfringement in such letter was consistent with Motorola's determination in 1941 (Trial Record 3546).

238. Western Electric Company was licensed by Armstrong for Mobile and Miscellaneous Communication apparatus (Plaintiff's Exhibit 16, p. 3) for the

period January 2, 1946, to December 26, 1950, and during that period Western Electric Company purchased from Motorola for resale in the Bell System, Motorola two-way FM radio telephone equipment including the specific equipments which plaintiff charges herein to infringe the '066 and '069 patents. Periodic royalty reports under said license were rendered to Armstrong by Western Electric from December 14, 1946, through December 26, 1950 (Trial Record 4944). Such Motorola equipment was specifically identified on each such royalty report by the words "Galvin," or "Motorola." Approximately half of all licensed apparatus sold by Western Electric and so reported to Armstrong was such Motorola equipment, and close to one-third of the total royalties of $364,552.59 paid by the licensee (Trial Record 4946) were on such equipment.

### A. Television Sound Receivers

239. Each of the Motorola television sound receivers TS–4 and TS–5 is capable of receiving frequency modulated waves sent out by television sound transmitters which furnish broadcasting service in accordance with the Rules of the Federal Communications Commission and is capable of producing a sound signal from said frequency modulated waves. Each of the receivers TS–4 and TS–5 is capable of responding to such frequency modulated waves when said waves are modulated to have a deviation of ±25 kilocycles or a peak-to-peak swing of 50 kilocycles (Trial Record 223–224, 230–231).

240. For television sound broadcasting, a deviation of ±25 kilocycles (or peak-to-peak swing of 50 kilocycles) is defined as 100 per cent modulation in the Rules of the Federal Communications Commission. Those Rules specify that the percentage of modulation shall in no case be less than 85 per cent nor more than 100 per cent on peaks of frequent recurrence during any selection which normally is transmitted at the highest level of the program under consideration (Plaintiff's Exhibit 67, pp. 10, 11; Trial Record 224).

241. In each of the receivers TS–4 and TS–5, the effective bandwidth of all the radio frequency stages and intermediate frequency stages is at least 50 kilocycles (Trial Record 2151, 1883, 226, 230–231).

242. In each of the television receivers TS–4 and TS–5 the received frequency modulated signal is amplified in a radio frequency amplifying stage and in several intermediate frequency amplifying stages before being applied to the balanced detector circuit (Plaintiff's Exhibits 27, p. 2, and 28, p. 1; Trial Record 1902–6).

243. The receiver TS–5 contains a limiter stage (V–12) ahead of the balanced detector circuit which makes the receiver substantially nonresponsive to amplitude variations caused by noise and disturbances (Plaintiff's Exhibit 32A, Chart 9; Trial Record 229–31, 1934–35; Plaintiff's Exhibit 91, pp. 488–489).

244. The balanced detector circuit employed in the receiver TS–5 is known in the art as the Foster-Seeley discriminator and provides a linear (proportional) audio response to frequency variations throughout the range of swing of the received wave and up to a swing of 50 kilocycles (Trial Record 280–1, 286–7, 5254, 5257, 5412–14; Plaintiff's Exhibit 77B, Response to Interrogatory 5C and Exhibit T).

245. The Foster-Seeley discriminator in the receiver TS–5 reduces the response of the receiver to amplitude variations in the received wave by the balancing action of the detectors as described in the '069 patent, page 3, lines 69–90 (Trial Record 190–2).

246. The receiver TS–4 contains a combined limiter and balanced detector circuit known in the art as the "ratio detector" (Plaintiff's Exhibit 91, p. 488). The limiting action of the ratio detector makes the receiver TS–4 substantially nonresponsive to amplitude variations. (Heisig testified that the ratio detector would suppress amplitude variations by 30 to 1 (Trial Record 2223–4). His testimony on redirect (Trial Record 2265) that the ratio detector would not

handle 7 db downward modulation meant only that the ratio detector would not perform so well if the strength of the received wave fell momentarily to about 30% of its normal value. Heisig also testified that the stage labeled "limiter" ahead of the ratio detector was intended to "drive the ratio detector with the proper signal to get proper ratio detector action" (Trial Record 1906). Heisig conceded that the Armstrong receiver referred to in the '069 patent could have provided less amplitude rejection than the ratio detector and still have given the particular improvement in noise reduction that Armstrong stated he had measured (Trial Record 225, 292, 296–7, 2234–6). Town testified that the limiting in the ratio detector is "quite different" from the type of limiting disclosed in the '069 patent in that in the receiver described in the patent, the limiter minimizes variations in the signal before the signal reaches the discriminator (Trial Record 5356). In Finding 33, it is pointed out that the '069 patent does not state that there is any criticality to the sequence of steps. As a matter of law, infringement is not avoided by the combination of limiting and detection in one stage instead of in separate stages as specifically disclosed in Fig. 2 of the '069 patent. The established principle was recently stated by this Court as follows: "While infringement can be avoided by the failure to use a material element of the claim of a patent, such infringement is not avoided where all elements are utilized in a combined form." (Minnesota Mining & Mfg. Co. v. Technical Tape Corp., 200 F.Supp. 753, 760 (1961), and authorities there cited. This is particularly applicable to commercial radio receivers where the use of dual purpose tubes and circuits is common practice (Trial Record 1674). Also, it is particularly apposite in the case of the '069 patent which disclosed an invention that has profoundly influenced the radio art.)

247. The ratio detector in TS–4 provides a linear (proportional) audio response to frequency variations through-

out the range of swing of the received wave and up to a swing of 50 kilocycles (Trial Record 5254, 5257; Plaintiff's Exhibit 77B, Answer to Interrogatory 5C and Exhibit T).

248. The ratio detector in the receiver TS–4 also reduces the effects of amplitude variations in the received wave by the balancing action of the detectors as described in the '069 patent, page 3, lines 69–90 (Trial Record 190–2, 1916–7).

249. Each of the television receivers TS–4 and TS–5 effectively reproduces the audio signal over a range with an upper limit of about 5,000 cycles (Trial Record 227, 1898–1901, 2241, 2752).

250. Motorola in its design of such receivers has provided for an effective audible frequency range which is about the same as is normally provided in receivers for the Standard Broadcast Band (Trial Record 1901, 2241). Heisig testified that the AM radio broadcast receivers gave better sound reproduction than the TV receivers but with such a comparison not taking into consideration operation under bad noise conditions (Trial Record 2241).

251. Each of the receivers TS–4 and TS–5 is capable of suppressing noise to a degree which, at many locations, would be readily perceptible to the listener as compared with what could be achieved with reception in an amplitude modulation system at the same frequency and power (Trial Record 2231–6, 2751–6, 2762–6, 4019–22; Plaintiff's Exhibit 91, p. 484).

252. In the normal and expected use of the foregoing Motorola television sound receivers, the user would not make any change or adjustment in the bandwidth of the circuits, the radio frequency and intermediate frequency amplification, the limiter circuits or the balanced detector circuits (Trial Record 350, 2249, 2264). It is material that the patented teaching was directed to and was utilized by the manufacturer as distinguished from its customer or user (American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103 (2nd Cir. 1923), and sub-

sequent decision on accounting, 16 F.2d 823 (S.D.N.Y.1926)).

253. The foregoing television sound receivers have no practical use other than to receive the frequency modulated waves sent out by the television sound transmitters of television stations which furnish a broadcasting service in accordance with the Rules of the Federal Communications Commission (Trial Record 352, 650–1).

254. In the course of the design, manufacture and marketing thereof, Motorola has tested the performance of the foregoing television sound receivers by tuning such television receiver to television sound signals on the air and listening to such receivers (Plaintiff's Exhibit 77A; Trial Record 1876, 1890–1, 1987–8).

255. The foregoing television sound receivers are especially adapted for use in the wide band FM system (Trial Record 651, 2339–41).

(See also Findings 298–301.)

### B.  FM Broadcast Receivers

256. Each of the frequency modulation broadcast receivers HS87 and HS89 is capable of receiving frequency modulated waves sent out by frequency modulation radio transmitters which furnish broadcasting service in accordance with the Rules of the Federal Communications Commission and is capable of reproducing a sound signal from said frequency modulated waves. Each of said receivers HS87 and HS89 is capable of responding to such frequency modulated waves when said waves are modulated to have a deviation of ±75 kilocycles or a peak-to-peak swing of 150 kilocycles (Plaintiff's Exhibit 32A, Charts 3–6; Trial Record 208–11, 218–22, 1066–7).

257. For FM broadcasting, a deviation in frequency of ±75 kilocycles (or peak-to-peak swing of 150 kilocycles) is defined as 100 per cent modulation in the Rules of the Federal Communications Commission. Those Rules specify that the percentage of modulation shall be maintained as high as possible consistent with good quality of transmission and good broadcast practice and in no case less than 85 per cent nor more than 100 per cent on peaks of frequent recurrence during any selection which normally is transmitted at the highest level of the program under consideration (Plaintiff's Exhibit 67, pp. 4, 6; Trial Record 211, 221–2).

258. In each of the receivers HS87 and HS89, the effective bandwidth of all the radio frequency stages and intermediate frequency stages is at least 150 kilocycles (Trial Record 212–3, 221–2, 1066–7, 1487).

259. In each of the receivers HS87 and HS89, the received frequency modulated wave is amplified in a radio frequency stage and in several intermediate frequency amplifying stages before being applied to the balanced detector circuit (Plaintiff's Exhibits 25, p. 1, and 26, p. 2; Trial Record 1458–9, 1472).

260. In receiver HS87, the balanced detector circuit is a ratio detector (Trial Record 213) and in receiver HS89 the balanced detector circuit is a Foster-Seeley discriminator (Trial Record 220, 5412–4). Each of such balanced detector circuits provides a linear (proportional) audio response to frequency variations throughout the range of swing of the received wave and up to a swing of 150 kilocycles (Trial Record 5258–9). Each of such balanced detector circuits reduces the effects of amplitude variations in the received wave by the balancing action of the detectors as described in the '069 patent, page 3, lines 69–90 (Trial Record 190–2).

261. The ratio detector in the receiver HS87 performs a limiting action and makes the receiver substantially nonresponsive to amplitude variations of the received wave (Trial Record 213, 1460, 1464, 1508–10; Plaintiff's Exhibit 91, pp. 488–492). (Williams testified that automatic volume control in HS87 optimizes the performance of the ratio detector, that Motorola attempts to get good performance from its ratio detectors and that the ratio detector might provide

amplitude rejection, exclusive of the balancing action, in the order of 15 or 20-to-1 (Trial Record 1699–1703). See statement re ratio detector following Finding 246.)

262. In the receiver HS89, there is some reduction of amplitude variations ahead of the balanced detector circuit, but there is no evidence of the substantial limiting action which would be provided by a separate limiter stage or by the ratio detector (Plaintiff's Exhibit 77B, Defendant's answer 6A; Trial Record 5358; cf. Trial Record 1474).

263. In the receiver HS89, there is provision, primarily by virtue of the balancing action of the Foster-Seeley discriminator across the wide band of the Receiver, for suppressing to an appreciable degree the effects of amplitude variations and thereby securing some of the advantage of noise suppression provided by the wide band FM system (Trial Record 190–2, 1477, 1727–31). (In the Motorola Manual on HS89 (Plaintiff's Exhibit 26), the receiver is described as providing "noise free FM reception" and at page 6 it is stated that the "discriminator does not respond to amplitude modulation." Everitt testified that balancing is a form of limiting (Trial Record 1280, 3180) and in the '069 patent, page 1, column 1, lines 38–41, Armstrong referred to the removal of amplitude variations by "current limiting" or "some equivalent process." Heising and Town expressed the view that limiting is not the essence of what Armstrong discovered (Trial Record 4083, 4543, 5332–3, 5422, 5417–20). It is established law that infringement is not avoided by imperfect practice of an invention. Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 90 F.2d 178, 194–195 (7th Cir. 1937); cert. den. 302 U.S. 729, 58 S.Ct. 54, 82 L.Ed. 563, (1937)).

264. The receiver HS87 is capable of suppressing both noise and interference to a substantial degree as compared with what could be achieved with an amplitude modulation receiver operating at the same frequency and field strength and reproducing the same audible frequency range (Trial Record 349–50, 2689–93; Plaintiff's Exhibits 91, pp. 481–3, and 25, pp. 2 and 5).

265. In the normal and expected use of the foregoing Motorola FM broadcast receivers, the user would not make any change or adjustment in the bandwidth of the circuits, the radio frequency and intermediate frequency amplification, the limiter circuits or the balanced detector circuits (Trial Record 350).

266. The foregoing FM broadcast receivers have no practical use other than to receive the frequency modulated waves sent out by the FM broadcast transmitters of stations which furnish an FM broadcasting service in accordance with the Rules of the Federal Communications Commission (Trial Record 352, 650–1; 1730–1).

267. In the course of the design, manufacture and marketing thereof, Motorola has tested the performance of the foregoing FM broadcast receivers by tuning such FM broadcast receivers to FM broadcast signals on the air and listening to such receivers (Plaintiff's Exhibit 77A; Trial Record 1788).

268. The foregoing FM broadcast receivers are especially adapted for use in the wide band FM system (Trial Record 349–50, 650–1, 1730–1). (See also Findings 294–297.)

C. FM Communication Equipment

269. The Motorola 25–50 Mc and 152–162 Mc equipments include transmitters and receivers, and each of such equipments is adapted to provide point-to-point communication by the transmission and reception of frequency modulated waves (Plaintiff's Exhibits 30, 31, 92, 106; Trial Record 4397–4400, 5421–2).

270. The transmitters in each of such equipments are capable of producing and transmitting a frequency modulated wave with a peak-to-peak swing of about 30 kilocycles and modulated by frequencies of the human voice up to but not exceeding about 3000 cycles. The receivers in each of such equipments are capable of

receiving such frequency modulated waves and of reproducing therefrom the transmitted signal over an audible range with an upper limit of about 3000 cycles (Trial Record 232–4, 239–40).

271. In the receivers of each of such communication equipments the effective bandwidth of all of the radio frequency and intermediate frequency stages is at least 30 kilocycles. Each of such receivers contains two stages of radio frequency amplification and at least three stages of intermediate frequency amplification (Trial Record 232, 234–8, 242, 2287–8, 2337–8; Plaintiff's Exhibit 32A, Charts 11, 13).

272. Each of the receivers in such equipments contains two limiter stages which operate, in the presence of a quieting signal (which may be weaker than 1 microvolt per meter), to make the receiver substantially nonresponsive to amplitude variations caused by noise (Plaintiff's Exhibit 30 Sensicon Receiver, p. 163; Plaintiff's Exhibit 31 Standard Receiver Data, pp. 1–9; Trial Record 3037–9, 3373–4).

273. The receivers in each of such equipments contain a balance detector circuit which was referred to at the trial as the Bond circuit (Trial Record 305–9, 658–9). The Bond circuit produces a linear audio response to variations in frequency of the received wave over a range up to the peak-to-peak swing of 30 kilocycles (Trial Record 3041–3).

274. The noise quieting action which occurs in the foregoing receivers in the presence of a received signaling wave is a characteristic of performance that is unique to frequency modulation receivers capable of suppressing noise as compared with AM receivers operating under comparable conditions (Trial Record 3009–14, 3037–9, 3373–4; Plaintiff's Exhibits 105, 30, 31, see references to quieting action in receivers; Trial Record 4421–3 and Plaintiff's Exhibit 120, p. 448; Plaintiff's Exhibit 91, p. 484).

275. The Motorola 25–50 Mc and 152–162 Mc communication equipments are an application of the wide band FM system (Trial Record 4413–7, 5155–6).

## X. INFRINGEMENT BY MOTOROLA OF PATENT NO. 1,941,066

276. The FM detector circuits of the '066 patent have not been used commercially (Trial Record 2105, 5037), and the uncontroverted testimony is that they are not suitable for commercial use (Trial Record 1611, 1612, 1965). Armstrong stated in an amendment in the '066 application filed October 26, 1931: "The system covered by the present application has been working in reception across the continent for some time. The applicant would be glad to demonstrate it to the Examiner if such demonstration is desired." (Defendant's Exhibit D2, p. 22). However, Armstrong did not include either of the FM detector circuits of the '066 patent in the FM receiver of his '069 patent or his Reissue patent (Trial Record 496, 497, 5037), both of which were filed long after the date of such amendment. Plaintiff's witness Heising acknowledged on cross-examination that he knew of no receivers manufactured and used for FM radio broadcast reception or television reception in the period 1940 to 1957 which had detectors with series resonant circuits (Trial Record 4588), and there is no evidence that any Armstrong patent licensee as listed in Plaintiff's Exhibits 15 and 16 employed the same. The '066 detector circuits of Figs. 1 and 2 each include a series resonant circuit (Items 16, 17 and 18 of Fig. 1; Items 58, 59 and 60 of Fig. 2). Motorola's witness Heisig testified that the circuit of Fig. 2 of the '066 patent would cost the consumer $12 to $16 more than the circuit used by Motorola in the television receiver of Plaintiff's Exhibit 29 (Trial Record 1966–1973).

277. Plaintiff concedes that the circuit specifically as described in the '066 patent has not been in commercial use in recent years, although Major Armstrong did employ it in his early experimental work. But the '066 patent disclosed the synchronous heterodyne principle; that

principle was first embodied in the circuit specifically disclosed in the '066 patent; that principle was broadly covered by claims 8, 9 and 10 of the patent, as affirmed in the interference proceeding, and that principle has been embodied by Motorola in all of its FM receivers.

278. Plaintiff further concedes that series resonant circuits as employed by Major Armstrong in his experimental receivers and specifically disclosed in all three of the patents in suit have not been in commercial use. But series resonant circuits are not an essential element in any of the inventions in suit, are not referred to in any of the claims in suit, and no witness testified to the contrary.

279. The circuits described in the '066 patent are "narrow band" circuits as plaintiff has applied those words to the prior art circuits (Trial Record 5367, 5371). The receiver of Fig. 1 (relating to telegraphy with a signaling and marking wave, covered by claim 5 not here in suit) of the '066 patent as described in the specification has a bandwidth of only 50 cycles (Trial Record 2085, 5367). The receiver of Fig. 2 of the '066 patent as described in the specification has a bandwidth of no more than 12,000 or 13,000 cycles (Trial Record 2102, 5039, 5371, 5372). In order to receive radio waves transmitted according to FCC standards, the three types of Motorola receivers in issue require respectively, bandwidths of 150,000 cycles, 50,000 cycles and 30,000 cycles (Trial Record 2085, 2102, 2103, 5372). The circuits of Fig. 1 and of Fig. 2 as described in the '066 patent could not be used in any one of such three types of receivers, and the circuits would have to be redesigned for wide band operation.

A. The Foster-Seeley Discriminator

280. The FM broadcast receiver HS89 and television sound receiver TS–5 include a balanced detector circuit which is known in the art as the Foster-Seeley discriminator (Trial Record 277, 1521, 1647, 1944, 5412–4).

281. The Foster-Seeley discriminator operates in accordance with the synchron-ous heterodyne principle to reproduce the signal (Trial Record 320, 5180–6, 5376–81; Court Exhibit 1, p. 81).

282. The Foster-Seeley discriminator includes a tuned circuit inductively coupled to the preceding circuit and a pair of diodes connected at opposite ends of such tuned circuit. Each of the diodes acts as a detector (Plaintiff's Exhibit 32B, Chart 4; Defendant's Exhibit 74; Trial Record 282–3, 560–1).

283. In the Foster-Seeley discriminator, the received frequency modulated wave reaches each of the diodes over two paths having different characteristics of transmission and the waves from the two paths, varying synchronously in frequency, are combined or heterodyned at each of the detectors to reproduce the signal (Trial Record 5397–5400, 5193–4; Court Exhibit 1, p. 86; Trial record 289–92, 2122; Plaintiff's Exhibit 91, pp. 489–90).

284. The tuned circuit in the Foster-Seeley discriminator provides a combination of reactance elements in one of the paths leading to each of the detectors and produces a variation in phase in accordance with the signal as between the two waves that are combined or heterodyned at each detector (Trial Record 293, 298–9, 2124–6; Plaintiff's Exhibit 91, pp. 489–490).

B. The Ratio Detector

285. The FM broadcast receiver HS87 and the television sound receiver TS–4 include a balanced detector which is known in the art as the ratio detector (Trial Record 292–3, 636–7, 1636).

286. The ratio detector operates in accordance with the synchronous heterodyne principle to reproduce the signal (Trial Record 320, 5180–6, 5376–81).

287. The ratio detector includes a tuned circuit inductively coupled to the preceding circuit and a pair of diodes connected at opposite ends of such tuned circuit. Each of the diodes acts as a detector (Trial Record 293–5, 2128, 2130–1; Plaintiff's Exhibit 32B, Chart 7; Defendant's Exhibit 75).

288. In the ratio detector, the received frequency modulated wave reaches each of the diodes over two paths having different characteristics of transmission and the waves from the two paths, varying synchronously in frequency, are combined or heterodyned at each of the detectors to reproduce the signal (Trial Record 301–2, 5397–5400, 5193–4; Court Exhibit 1, p. 86; Plaintiff's Exhibit 91, pp. 489–91).

289. The tuned circuit in the ratio detector provides a combination of reactance elements in one of the paths leading to each of the detectors and produces a variation in phase in accordance with the signal as between the two waves that are combined or heterodyned at each detector (Trial Record 298–9; Plaintiff's Exhibit 91, pp. 489–91).

### C. The Bond Circuit

290. The receivers in the 25–50 Mc and 152–162 Mc communication equipments include a balanced detector circuit that was referred to at the trial as the Bond circuit. The Bond circuit is like the Foster-Seeley discriminator except that the tuned circuit is capacitively rather than inductively coupled to the preceding circuit (Trial Record 305–7, 320, 5193–4; Court Exhibit 1, p. 86).

291. The Bond circuit operates in accordance with the synchronous heterodyne principle to reproduce the signal (Trial Record 320, 309–19, 5180–6, 5191–6; Court Exhibit 1, pp. 86–9).

292. In the Bond circuit, the received frequency modulated wave reaches each of the diodes over two paths having different characteristics of transmission and the waves from the two paths, varying synchronously in frequency, are combined or heterodyned at each of the detectors to reproduce the signal (Trial Record 309–17, 3054–69, 4186–9, 4699–4700, 5190–6, 5360–2, 5397–5400; Court Exhibit 1, pp. 86–9).

293. The tuned circuit in the Bond circuit provides a combination of reactance elements in one of the paths leading to each of the detectors and produces a

variation in phase in accordance with the signal as between the two waves that are combined or heterodyned at each detector (Trial Record 309–14, 317–8, 3054–69, 5191–4; Court Exhibit 1, pp. 88–9).

### XI. INFRINGEMENT BY MOTOROLA OF REISSUE PATENT NO. 21,660

#### A. FM Broadcast Receivers

294. Each of the FM broadcast receivers HS87 and HS89 contains a de-emphasis network which passes the lower audio frequencies of the signal to a greater degree than the higher audio frequencies. The de-emphasis circuits produce an effect on the audio frequencies at the receiver in accordance with the characteristic of a resistance-capacitance network having a time constant of about 75 microseconds and compensate for the pre-emphasis at the transmitter provided for in the Rules of the Federal Communications Commission (Trial Record 339–47, 1528–30, 1535–46, 1980–5).

295. Each of the receivers HS87 and HS89 contains a discriminator which has an output amplitude versus input frequency characteristic with a peak-to-peak width, or admittance band, having a value of about 250 kilocycles. The admittance band of such discriminator is substantially greater than the extent of swing of the received frequency modulated wave (Trial Record 339–45, 618–20, 1743; Plaintiff's Exhibit 77B, Exhibit V). (For references to admittance band, see Trial Record 618–20, 1995–6, 5249–51).

296. In the normal and expected use of the foregoing receivers in receiving FM programs, the user would not make any change or adjustment in the de-emphasis network or in the admittance band of the discriminator (Trial Record 350).

297. The foregoing FM broadcast receivers are designed for use in a system having the amount, or degree, of pre-emphasis and de-emphasis disclosed in the Reissue patent (Trial Record 349–50).

### B.  Television Sound Receivers

298.  Each of the television sound receivers TS–4 and TS–5 contains a de-emphasis network which passes the lower audio frequencies of the signal to a greater degree than the high audio frequencies.  That network produces an effect on the audio frequencies at the receiver in accordance with the characteristic of a resistance-capacitance network having a time constant of about 75 microseconds and compensates for the pre-emphasis provided for in the Rules of the Federal Communications Commission (Trial Record 346–9, 1980–5).

299.  Each of the receivers TS–4 and TS–5 contains a discriminator which has an output amplitude versus input frequency characteristic with a peak-to-peak bandwidth, or admittance band, having a value of about 160 kilocycles.  The admittance band of such discriminator is substantially greater than the extent of swing of the frequency modulated wave (Plaintiff's Exhibit 29, p. 2;  Plaintiff's Exhibit 77B, Exhibit T;  Trial Record 2256–7, 5254–8).  (For references to admittance band, see Trial Record 618–20, 1995–7, 5249–51.)

300.  In the normal and expected use of the foregoing receivers in receiving television sound programs, the user would not make any change or adjustment in the de-emphasis network or in the admittance band of the discriminator (Trial Record 350).

301.  The foregoing television sound receivers are designed for use in a system having the amount or degree of pre-emphasis and de-emphasis disclosed in the Reissue patent (Trial Record 346–7).

### XII.  THE UNLICENSED MANUFACTURE AND SALE OF FM APPARATUS BY MOTOROLA

302.  In 1940, Motorola decided that it would manufacture and sell FM apparatus for police and mobile communication (Trial Record 3551–2, 3642, 3696, 3719).  At that time, Motorola was encountering sales resistance to its AM communication apparatus (Trial Record 3726) and saw a "fair future" for FM two-way communication (Trial Record 3555).  At the end of 1940, Motorola decided that it would add FM broadcast receivers to its line of home receivers in order to meet the competition of other radio manufacturers in that market (Trial Record 1022, 1646, 3553, 3642, 3757).

303.  When Motorola entered the FM market in 1940 and 1941, Major Armstrong was being publicly acclaimed as the inventor of the wide band FM system (Plaintiff's Exhibits 44, 51, 54, 55, 78, 92, 117 and 119).

304.  The manufacturers of FM apparatus who had preceded Motorola in the market, including General Electric Company, Zenith Radio Corporation, Scott Radio Laboratories, Inc., Stromberg-Carlson Company, Stewart-Warner Corporation, Radio Engineering Laboratories and F. M. Link, had publicly announced that they were licensed under the FM patents of Major Armstrong and had publicly acknowledged that their entry into the market was in close association with Major Armstrong (Plaintiff's Exhibits 78 and 117).  It was common knowledge and well known to Motorola that Major Armstrong expected to receive royalties on a uniform basis from all manufacturers of wide band FM apparatus and that he was actively engaged in establishing a uniform licensing system (Plaintiff's Exhibit 53 [pp. 47, 130–40, 207–18], 111B, 117 and 147).

305.  By 1940, and as a result of the activities of Major Armstrong and his licensees, the superior performance of the wide band FM system was generally acknowledged in the radio industry and had become a matter of interest to the general public (Plaintiff's Exhibits 44, 45, 46, 47, 48, 49, 50, 51, 54 and 55).  The Federal Communications Commission had set standards providing for the use of the wide band FM system in a new broadcasting service, and in the following year (April 1941) the Commission would provide for its use in television sound (Plaintiff's Exhibits 67, 68 and 69).  The wide band FM system was also being ap-

plied by companies licensed by Major Armstrong (General Electric Company, Radio Engineering Laboratories and F. M. Link) for point-to-point mobile communication (Trial Record 3029–32, 3708–11, 4035, 4406–9; Plaintiff's Exhibits 49, 117, 121 #44).

306. In March, 1940, Radio Engineering Laboratories, a licensee of Major Armstrong, had demonstrated FM communication to the Chicago City Police Department and had secured an order for the delivery of FM apparatus (Trial Record 4029–35). The demonstration was attended by representatives of Motorola (Trial Record 4035). Motorola had not then sold any FM apparatus but subsequently, in 1941 and thereafter, supplied such apparatus to the Chicago City Police Department (Trial Record 4048; Defendant's Exhibit 91).

307. As an important step in entering the FM market, Motorola sought out and, in September, 1940, employed Daniel E. Noble as Director of Research (Trial Record 4292, 4301; Plaintiff's Exhibit 111B, pp. 7–8). Concurrently, Motorola released publicity stating that Noble was a leading authority on FM, that he had "worked closely with Major Edwin H. Armstrong, inventor of the FM system, in experimental work during the past four years" and that Noble would work on the development of FM communications equipment for both emergency services and military applications (Plaintiff's Exhibit 119; Trial Record 4430–2).

308. In 1946, Noble became Vice President of Motorola, in charge of Communications and Electronics Division, was elected a Director in 1948 and subsequently was appointed an Executive Vice President of the Company (Defendant's Exhibit 50; Trial Record 4292–4).

309. Noble's association with Major Armstrong had begun in May, 1936, when he approached Major Armstrong, after having read his IRE paper, and requested his assitance in designing an FM relay station and, subsequently, an FM broadcast transmitter (Plaintiff's Exhibit 121 #1 and #6; Trial Record 4329–39).

Major Armstrong demonstrated the wide band FM system to Noble and during the ensuing four years there was extensive communication between Armstrong and Noble concerning the wide band FM system and Noble's study and activity in designing wide band FM apparatus (Plaintiff's Exhibit 121 #1 to 54; Trial Record 4326–4430). During that period, Noble, then a member of the faculty at Connecticut State College, submitted a paper at Massachusetts Institute of Technology concerning the Armstrong wide band FM system (Trial Record 4359–70), designed an FM broadcast transmitter for Station WDRC on Mt. Meriden, Connecticut (Trial Record 4298–9), and published a paper in QST in August, 1939, in which he described the noise-reducing properties and basic structural and operating characteristics of transmitters and receivers in the wide band FM system and attributed that development to Major Armstrong (Plaintiff's Exhibit 92; Trial Record 4397–4400). In correspondence with Major Armstrong in November, 1938, Noble expressly acknowledged his obligation to Major Armstrong and stated that he would not plan to publish anything about FM without Armstrong's permission (Plaintiff's Exhibit 121 #39).

310. Noble, acting as a consultant, was primarily responsible for the design and field testing of an FM system for the Connecticut State Police which went into operation on a state-wide basis in 1940 (Defendant's Exhibit 47; Plaintiff's Exhibit 93; Trial Record 4304). The apparatus, operating on a bandwidth of 40 Kc, with a deviation ratio of 4 and having substantial noise-reducing properties characteristic of the wide band FM system, was manufactured by F. M. Link and, to the knowledge of Noble, was licensed by Major Armstrong (Defendant's Exhibit 47; Plaintiff's Exhibits 93, 121 #47 and #49; Trial Record 4313, 4416–8).

311. Noble wrote to Armstrong in February, 1940, in connection with the FM system for the Connecticut State

Police that he cherished the idea of being the first to apply Major Armstrong's invention (the wide band FM system) to police work and that he was trying to do a job that would reflect credit on his own engineering and on Major Armstrong's "great invention" (Plaintiff's Exhibit 121 #47; Trial Record 4413–8). He testified he used the word "invention" in "a generic sense, not in any relationship to patents" (Trial Record 4415). He further testified that he "would qualify very definitely any suggestion that [his] * * * was a close technical detail relationship [with Major Armstrong] that simply did not exist" (Trial Record 4432).

312. Noble testified before the Federal Communications Commission in March, 1940, that the noise-reducing properties of the wide band FM system were obtained in police communication as well as in FM broadcasting (Plaintiff's Exhibit 120; Trial Record 4423).

313. In September, 1940, Noble, having become Director of Research for Motorola, wrote to Major Armstrong as follows:

"Your invention of the frequency modulation system has revolutionized my life as well as the radio industry. The temptation to devote all of my time to FM proved too strong to resist and I have accepted the position with the Galvin Manufacturing Corporation as head of the Division of Research.

"I am hoping that I can make some contributions to the use of FM for military purposes in addition to the work on the usual applications.

"May I thank you again for your generous co-operation in the matter of the license for the Connecticut State Police equipment, and for your many past favors. I hope we may continue to co-operate fully even if I have sacrificed my 'amateur standing.'" (Plaintiff's Exhibit 121 # 53; Trial Record 4428.)

314. In November and December, 1940, there was published in Electronics magazine a paper by Daniel E. Noble, then associated with Motorola, entitled "A State-Wide FM Police Network" (Plaintiff's Exhibit 93). The article gave a full account of the technical and operational charateristics of the FM system for the Connecticut State Police (Trial Record 4304). The FM police and mobile apparatus built by Motorola and by Armstrong's licensees during the following ten years was substantially similar to such apparatus with respect to bandwidth, deviation ratio and noise-reducing properties (Trial Record 4480–2, 2997–3014; Defendant's Exhibit 47; Plaintiff's Exhibits 105, 106).

315. Noble testified that when Motorola "started out in the mobile communications field * * * 'we decided to build the best equipment we could possibly make without attempting to compete in price with cheaper units, so we never sold packages, we sold complete systems dealing directly with the customer and engineering the system to his requirements. As a result we captured and held the market and have better than 50 per cent of it today [1960].'" (Trial Record 3701, 4302.)

316. When deciding to enter the FM market, Motorola was well aware that the question of whether to take a license under the Armstrong FM patents, as had been done by its predecessors in the market, was an important matter of policy for the Company (Plaintiff's Exhibit 111B; Trial Record 3536–40). In 1940 and 1941, Motorola investigated the Armstrong FM patents and communicated with its licensor, Radio Corporation of America, concerning such patents, particularly defenses that might be raised against the '069 patent, and the matter of taking a license under the Armstrong patents (Plaintiff's Exhibit 111A, Exhibit 1, 111B; Trial Record 3771).

317. In April, 1940, Norman E. Wunderlich, an employee of Motorola (Trial Record 4442; Defendant's Exhibit 47), wrote to Major Armstrong that Motorola was interested in the matter of licenses under his FM patents (Plaintiff's Exhibit

111A, Exhibits 2A, 2B, 2C). Major Armstrong sent to Motorola forms of his licenses for FM home receivers and mobile communication (Plaintiff's Exhibit 111A, Exhibit 2H; Defendant's Exhibit 46, McCormack letters March 29 and September 18, 1940). In May, 1940, Major Armstrong wrote to Motorola that the '069 patent covered the FM system, that his patent No. 1,941,068 covered an FM transmitter, that his '066 patent was important in the receiver field and that he owned other patents useful in the FM system (Defendant's Exhibit 46, Armstrong letter May 29, 1940).

318. On February 3, 1941, Paul Galvin, President of Motorola, wired Major Armstrong that he had given full authority to Foorman Mueller to negotiate with Armstrong on all matters relating to a license (Defendant's Exhibit 46, Galvin wire February 3, 1941). On April 28, 1941, Mueller submitted to Major Armstrong circuit diagrams of Motorola police communication apparatus from which circuit constants had been deleted and which gave no information as to swing, audio ranges or audio correction circuits at the transmitter and receiver, and requested that Major Armstrong identify each of his patents and each of the claims thereof which he believed were applicable to such apparatus (Defendant's Exhibit 46, Mueller letter April 28, 1941; Plaintiff's Exhibit 111B, pp. 9–10; Trial Record 3033–6). Dean Town testified that one early Motorola communications receiver did not employ a "synchronous heterodyne" detector, but rather a balanced slope detector (Court Exhibit 1, p. 14, lines 14, 15; p. 15, lines 3–6). This balanced slope type of detector is not used in any of the receivers involved in this action and referred to on pages 2 and 3 of these Findings (Finding 6).

319. Armstrong replied on May 1, 1941, that insufficient information had been submitted to him and that he would prefer to meet with Noble and Mueller and that at such a meeting he would give his viewpoint concerning the relation of his patents to the Motorola mobile apparatus when Noble could explain the circuits more fully (Defendant's Exhibit 46, McCormack letters May 1, 8 and 15, 1941). During the next three months, Mueller wrote repeatedly to Armstrong's attorney that he was willing to carry on the matter by such meetings, but Mueller and Noble did not at any time make themselves available for such a meeting (Defendant's Exhibit 46, Mueller letters May 5 and 14, July 14 and 18–19, 1941; Trial Record 3651–61).

320. On May 19, 1941, Mueller, in a discussion with a representative of RCA about the Armstrong situation, stated that if RCA were to settle with Armstrong for $1,000,000, Armstrong would have that much more money to use against nonlicensees like Motorola and that prestige would be added to Armstrong's patents (Plaintiff's Exhibit 111B, p. 11). Mueller also stated to the RCA representative that he might recommend that Motorola take a license under the Armstrong patents if Armstrong would reduce his royalty rate to one per cent (Plaintiff's Exhibit 111A, Tunick memo p. 2, and 111B, p. 10).

321. Late in 1941, Paul Galvin decided that Motorola would not take a license from Major Armstrong and Motorola thereafter continued to adhere to that decision (Trial Record 3547–9, 3759; see also Trial Record 3530 and Plaintiff's Exhibit 79A, p. 62). That decision was made when Motorola was already selling FM apparatus (Trial Record 3553, 1049–50 and Defendant's Exhibit 47) and about a year after Motorola had decided to enter the FM market and had set aside working capital for such purpose and had made expenditures in connection with securing an FM engineering staff (Trial Record 3642–5).

322. In refusing to take a license from Major Armstrong and in persisting in such refusal, the Motorola policy was in direct conflict with that of its competitors and in derogation of the open policy and practice of Major Armstrong that all manufacturers of apparatus for the wide band FM system would be licensed.

by him on equal terms (Plaintiff's Exhibits 117, 78, 147, 111B, 53, pp. 130–40). (For proof that Armstrong licensees were competitors of Motorola, see Trial Record 3708–9, 4307–10, 3029–32; Plaintiff's Exhibit 111B, p. 9). The alliance of Daniel Noble with Motorola was publicized and his former association with Major Armstrong emphasized. (Defendant's Exhibit 47; Trial Record 4292–302; Plaintiff's Exhibit 119).

323. In March, 1941, by letter to the Secretary of War and in May, 1941, by letter to the Secretary of the Navy, Major Armstrong waived all royalties under his FM patents with respect to FM apparatus manufactured for the United States Government for military purposes, and such waiver was a matter of public knowledge in the radio industry (Plaintiff's Exhibits 17–20, 79B).

324. In 1942, and for the duration of World War II, Motorola and other radio manufacturers ceased the production of home receivers and other equipment for broadcast purposes because of the demands of war production (Trial Record 1050, 3697). Motorola's total sales of FM broadcast receivers in 1941 and 1942 amounted to $36,588 as compared with postwar sales through 1950 in an aggregate amount of about $11,028,000 (Defendant's Exhibit 91). Motorola sold no television receivers until 1947 (Defendant's Exhibit 91).

325. From 1942 through 1945, Motorola manufactured FM apparatus for military uses having an aggregate selling price of about $132,800,000 (Defendant's Exhibit 92; Trial Record 3597; see Trial Record 3015). From 1941 through 1945 Motorola sold FM equipment for police communication, under releases issued by the War Production Board, in an aggregate amount of about $7,900,000, as compared with Motorola's post-war sales of such apparatus through 1950 in an aggregate amount of about $38,700,000 (Defendant's Exhibits 91, 92; Trial Record 3697). The fact that during World War II Motorola was primarily engaged in war production was a matter of public knowledge (Trial Record 3594).

326. During World War II, Major Armstrong was primarily engaged in research on behalf of the Armed Forces in connection with a continuous-wave radar system and with various applications of frequency modulation for military purposes (Trial Record 773–5). The fact that Major Armstrong was then engaged in research and development work for the Armed Forces was a matter of public knowledge in the radio industry (Plaintiff's Exhibit 79B).

327. During the War, Motorola communicated with RCA concerning post-war production of apparatus for civilian uses. On November 1, 1945, Motorola's attorney stated to RCA that the ratio detector (then being proposed by RCA for use in post-war FM receivers) was not a solution to the problem presented by the Armstrong patents (Plaintiff's Exhibit 111A, Exhibit 5; Plaintiff's Exhibit 111C).

328. In January, 1946, Western Electric Company executed a license from Major Armstrong for FM mobile communication apparatus and thereafter, until 1950, paid royalties to Armstrong with respect to such apparatus, including substantial quantities of such apparatus that Western Electric purchased from Motorola (Plaintiff's Exhibit 16; Trial Record 4944–6). In June, 1946, Motorola's attorney wrote to Western Electric Company and protested against the payment of royalties by Western Electric on Motorola apparatus (Defendant's Exhibit 48, Exhibit 6; Mueller letter of June 24, 1946). Motorola's attorney stated in his letter:

"You stated that it was your understanding that Western Electric will pay royalties to Armstrong under the license on the FM communication equipment which you are now buying from Galvin, and reselling, or leasing. As you know, we have investigated the various Armstrong patents at different times over the

past six years, and it has been and still is our considered opinion that the 'Motorola' F.M. equipment does not infringe any valid Armstrong patent. On this basis, Galvin has not taken a license from Major Armstrong.

" * * * It is our opinion that no royalty should be paid under your license on FM communication equipment which you purchase from Galvin, and if royalty is paid on the basis of your sale of the same, it should be clear that such payment is without Galvin's approval or consent, and that Galvin does not become bound in any way by such payment on Western Electric's part."

Thus, at the beginning of the post-war period and when Major Armstrong's '069 patent applicable to FM communication apparatus had about four years to run, Motorola reconfirmed and applied its decision against recognition of the Armstrong patents and did so in a manner which might interfere in the relations between Armstrong and one of his important licensees. Motorola thereby affirmed that its decision against taking an Armstrong license was not in reliance upon any apparent acquiescence by Major Armstrong, as has been pleaded in this action, but that such policy was, to the knowledge of Motorola, in direct conflict with the position taken by Major Armstrong and his licensees. Motorola affirmed its decision that the Armstrong situation would be left to the "fortunes of war" (Trial Record 3784–8, 3824).

329. By the end of 1947, when the post-war market for FM home receivers and television receivers had reached significant proportions, Motorola entered that market and sold substantial quantities of such receivers in competition with Armstrong licensees, including Zenith Radio Corporation, General Electric Company, Stromberg-Carlson Company, Stewart-Warner Corporation, Westinghouse Electric Corporation, Hallicrafters Company and Scott Radio Laboratories, Inc. (Trial Record 1663–7, 3677–82). The identity of the Armstrong licensees and their participation in that market was well known in the radio industry (Plaintiff's Exhibits 80, 81, 84). It was also generally known that other companies, including RCA, Philco Corporation, Emerson Radio and Phonograph Corporation and Admiral Corporation were manufacturing and selling FM apparatus without license from Major Armstrong. Armstrong and his FM patents had become a "cause celebre" (Plaintiff's Exhibits 84 and 87).

330. In July, 1948, Major Armstrong filed suit against RCA for infringement of the patents here in suit (Plaintiff's Exhibits 84, 85, 86, 87; Defendant's Exhibit 98). In December, 1948, Major Armstrong sent a written notice of infringement to Motorola and other infringers of his FM patents, informing them of his suit against RCA and stating that he would enforce his patents against infringers to the best of his ability (Plaintiff's Exhibits 12, 13; Trial Record 3731–2).

331. In January, 1949, RCA informed its licensees, at an open meeting to which representatives of Motorola were invited, that RCA would fight through the suit that Major Armstrong had brought against it with all of the vigor and aggressiveness at its disposal, that RCA would see to it to the best of its ability that such litigation would be completed before any other contemplated suits by Armstrong against any other companies could be started and completed, and pointed out that the main patent owned by Major Armstrong had less than two years to run (Plaintiff's Exhibit 111A, Exhibit 7; Plaintiff's Exhibit 111C).

332. In the years 1953 to 1957, Motorola discontinued the manufacture and sale of FM broadcast receivers, not as a result of any action or inaction by Armstrong, but because, in the judgment of Motorola, the market conditions for such equipment were unfavorable. Thereafter, Motorola resumed the manufacture and sale of FM broadcast receivers (Trial Record 1064–5, 1667–70).

333. On February 1, 1954, Major Armstrong died. In December, 1954, the action against RCA, after protracted and voluminous pre-trial proceedings, was terminated by a settlement between the parties involving a "reported" payment by RCA of about $1,040,000 to the Estate of Major Armstrong (Plaintiff's Exhibit 111B, p. 11; see reference to 15,000 pages of depositions in RCA case, Trial Record 4961).

334. The complaint herein was filed on January 6, 1954, within six years of when the industry and Motorola had begun to produce FM apparatus for non-governmental purposes in substantial quantity. *The lapse of time before Armstrong filed suit against Motorola has been satisfactorily explained. There is no evidence that Motorola has been prejudiced by reason of the filing of the complaint herein in January, 1954, rather than at an earlier time. Motorola had no reason to believe at any time before the complaint herein was filed that Major Armstrong had abandoned his rights against Motorola or that he acquiesced in Motorola's infringement of his FM patents.*

335. The refusal by Motorola from 1941 to 1954 to take a license from Major Armstrong and to pay him royalties in connection with its manufacture and sale of wide band FM apparatus was not in reliance upon any apparent or actual acquiescence by Major Armstrong. On the contrary, such refusal by Motorola was at all times in opposition and hostility to the openly maintained position of Major Armstrong, as affirmed by the interest of his numerous and prominent licensees, that all manufacturers of wide band FM apparatus should pay royalties to him on equal terms and that he would enforce his patents against infringers to the best of his ability.

336. In manufacturing and selling FM apparatus from 1941 and in increasing its sales of such apparatus and its expenditures in connection therewith after World War II, Motorola did not rely upon any acquiescence or inaction by Major Armstrong. On the contrary, Motorola assumed a calculated risk that the Armstrong FM patents might be defeated and that defiance of Armstrong's rights would redound to the commercial and financial gain of Motorola.

337. Armstrong took no action calculated to mislead Motorola upon which it relied to its prejudice. See Amalgamated Dental Co. v. Lang Dental Mfg. Co., 200 F.Supp. 814 (N.D.Ill.E.D. (1961)).

338. Motorola's unlicensed manufacture and sale of FM apparatus for police and mobile communication did not constitute willful and wanton infringement of the '069 patent and the '066 patent.

339. Motorola's unlicensed manufacture and sale of FM broadcast receivers and television receivers did not constitute willful and wanton infringement of the '069 patent, the '066 patent and the Reissue patent.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter. 28 U.S.C. §§ 1331, 1338.

2. The Executrix was properly substituted as plaintiff as a result of orders by this Court, dated March 28, 1955, and April 12, 1955. Pierce v. Allen B. DuMont Laboratories, Inc., 297 F.2d 323 (3rd Cir. 1961); Armstrong v. Allen B. DuMont Laboratories, 137 F.Supp. 659 (D.Del.1955); Armstrong v. Emerson Radio and Phonograph Corp., 132 F.Supp. 176 (S.D.N.Y.1955), followed by that Court in its later decision reported at 179 F.Supp. 95.

3. The '069 patent is valid and Motorola has infringed claims 1 and 2 thereof by the manufacture and sale of FM broadcast receivers, television sound receivers and FM communication apparatus. For liberality of construction and broad protection to be accorded to patents on inventions of great merit and broad scope, see Rubber Company v. Goodyear, 9 Wall. 788, 76 U.S. 788, 19 L.Ed. 566 (1869); Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S. Ct. 495, 53 L.Ed. 805 (1909); Eibel

**380**

Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Wright Co. v. Herring-Curtiss Co., 177 F. 257 (C.C.1910), aff'd final hearing, 204 F. 597, aff'd 211 F. 654 (2nd Cir. 1914) and companion case Wright Co. v. Paulhan, 177 F. 261 (C.C.S.D.N.Y.1910); American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103 (1923), and the decision on the accounting 16 F.2d 823 (S.D.N.Y.1926); Permutit Co. v. Wadham, 13 F.2d 454 (6th Cir. 1926), rehearing denied 15 F.2d 20; Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935). For plaintiff's right to recover on theory of contributory infringement, see Leeds & Catlin Co. v. Victor Talking Mach. Co., supra; Stewart-Warner Corporation v. Le Vally, 15 F.Supp. 571 (N.D.Ill.1936), affirmed Lincoln Engineering Co. of Illinois v. Stewart-Warner Corporation, 91 F.2d 757 (7 Cir. 1937), reversed on other grounds 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Girdler Corporation v. E. I. DuPont De Nemours & Co., 56 F.Supp. 871 (D.Del.1944), affirmed per curiam 152 F.2d 757 (3rd Cir. 1946); Detroit Lubricator Co. v. Toussaint, 57 F.Supp. 837 (N.D.Ill.E.D.1944), Metallizing Engineering Co. v. Metallizing Co. of America, 62 F.Supp. 274, 276–277 (S.D.N.Y.1945); Florence-Mayo Nuway Co. v. Hardy, 168 F.2d 778 (4th Cir. 1948); Harris v. National Machine Works, 171 F.2d 85 (10th Cir. 1948); 35 U.S.C. § 271(d) (3) 1952. See Memorandum Opinion of this Court dated June 14, 1961.

4. The '066 patent is valid and Motorola has infringed claims 8, 9 and 10 thereof by the manufacture and sale of FM broadcast receivers, television sound receivers and receivers for FM communication apparatus.

5. The Reissue patent is valid and Motorola has infringed claims 1, 2, 4 and 6 thereof by the manufacture and sale of FM broadcast receivers and television sound receivers.

6. Motorola had no license under the patents in suit by virtue of any license that it may have had under the '447 patent.

7. Plaintiff's right to recover damages is not barred by laches. Amalgamated Dental Co. v. Lang Dental Mfg. Co., 200 F.Supp. 814 (N.D.Ill.E.D.1961); Howe v. General Motors Corporation, 167 F.Supp. 330 (N.D.Ill.E.D.1958); Pierce v. International Telephone & Telegraph Corp., 147 F.Supp. 934 (D.N.J.1957). Armstrong was justified in not filing suit during World War II. Alliance Securities Co. v. De Vilbiss Mfg. Co., 41 F.2d 668 (6th Cir. 1930); Mills Novelty Co. v. Monarch Tool & Mfg. Co., 49 F. 2d 28 (6th Cir. 1931), certiorari denied 284 U.S. 662, 52 S.Ct. 37, 76 L.Ed. 561; Harries v. Air King Products Co., 87 F. Supp. 572, affirmed 183 F.2d 158 (2nd Cir. 1950). Armstrong was justified in not filing suit against Motorola while prosecuting an infringement suit against RCA. Montgomery Ward & Co. v. Clair, 123 F.2d 878 (8th Cir. 1941); Clair v. Kastar, Inc., 148 F.2d 644 (2nd Cir. 1945); Stearns-Roger Mfg. Co. v. Brown, 114 F. 939 (8th Cir. 1902); Timolat v. Franklin Boiler Works Co., 122 F. 69 (2nd Cir. 1903); United States Mitis Co. v. Detroit Steel & Spring Co., 122 F. 863 (6th Cir. 1903); Clements Mfg. Co. v. Eureka Vacuum Cleaner Co., 70 F.2d 701 (2nd Cir. 1934); Texas Co. v. Globe Oil & Refining Co., 112 F.Supp. 455 (N.D.Ill.E.D.1953).

8. Plaintiff is entitled to an accounting of the actual damages sustained by plaintiff and plaintiff's predecessor, Armstrong, as a result of the infringing manufacture and sale by Motorola of FM apparatus. All matters relating to patent marking and other notice of infringement and to the award of costs, attorneys' fees and interest are reserved for hearing at such accounting and for determination by this Court after such accounting shall be had.

### MEMORANDUM ACCOMPANYING FINDINGS OF FACT AND CONCLUSIONS OF LAW

In view of the extraordinary comprehensive Report, Court's Exhibit 1, for

identification, submitted before trial by the Expert, Dean George R. Town, appointed upon agreement of counsel, and the very detailed findings covering the mass of evidence, which findings of fact and conclusions of law are filed herewith, a separate opinion on the merits would be superfluous and repetitious. Furthermore, many of the points here made were covered in the extended opinion of Judge Edmund L. Palmieri in Armstrong v. Emerson Radio and Phonograph Corporation, 179 F.Supp. 95 (S.D.N.Y.1959), involving the same patents and claims as are here in suit. This Court is also in accord with Judge Palmieri's decision that there was no misuse of the '069 patent or the other patents in suit and that the Reissue was lawfully reissued. The Court wishes, however, to record its appreciation for the expert assistance rendered by Dean Town to the Court.